IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20100299-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (August 2, 2012) |
| Grace C. Kelson, | ) | |
| | ) | 2012 UT App 217 |
| Defendant and Appellant. | ) | |

-----

Third District, Salt Lake Department, 041901548
The Honorable Judith S. Atherton

Attorneys:     Stephen W. Howard, Salt Lake City, for Appellant
                    Mark L. Shurtleff and Karen A. Klucznik, Salt Lake City, for Appellee

-----

Before Judges McHugh, Orme, and Davis.

McHUGH, Presiding Judge:

¶1     Grace C. Kelson appeals her convictions for one count of offer or sale of
unregistered securities, a third degree felony, *see* Utah Code Ann. §§ 61-1-7, -21(1)
(2011); one count of sale by an unlicensed broker-dealer, agent, or investment advisor, a
third degree felony, *see id.* §§ 61-1-3, -21(1); three counts of securities fraud, second
degree felonies, *see id.* §§ 61-1-1, -21(2); and one count of pattern of unlawful activity, a

second degree felony, *see id.* §§ 76-10-1603, -1603.5 (2008).[1] We vacate Kelson's conviction for pattern of unlawful activity, and reverse and remand for a new trial on all other charges.


BACKGROUND

¶2    Kelson became acquainted with the owners (Owners) of a mortgage company, and later sought assistance from the mortgage company in financing two development projects:  a high-end resort near Heber City and another development in Brazil.  After these efforts failed to provide sufficient funding, Kelson and the Owners hoped to purchase a letter of credit to fund the developments.[2]  The letter of credit was to serve as collateral, thereby making it easier to find lenders for the project.  In this pursuit, Kelson and the Owners sought approximately $125,000 to obtain a letter of credit worth $15 million.

¶3    Around October 11, 2001, in response to an inquiry from one of the mortgage company's employees (Employee), Kelson explained that she and the Owners did not have the necessary funds to close a project.  Specifically, Kelson noted that she needed about $116,000 in "a couple of days" in order to close the deal.  Kelson mentioned that she would be willing to pay a finder's fee to Employee if she could assist in finding

---

[1]Because the relevant provisions of these statutes have not been materially changed, unless otherwise noted, we cite the current version of the Utah Code for the convenience of the reader.

[2]A "letter of credit" is defined as
> [a]n instrument under which the issuer (usu[ally] a bank), at a customer's request, agrees to honor a draft or other demand for payment made by a third party (the beneficiary), as long as the draft or demand complies with specified conditions, and regardless of whether any underlying agreement between the customer and the beneficiary is satisfied.

*Black's Law Dictionary* 987 (9th ed. 2009) (emphasis omitted).

someone to provide the money and indicated that the lenders could make their money back "five times."

¶4    After obtaining assurances from one of the Owners that it was a "legitimate deal" and that the money would be returned in approximately two to three weeks when they obtained the letter of credit, Employee approached her family members about investing in the project.  Within a day or two, she raised $22,400 from herself, her husband, her daughter, and a friend, which she exchanged for a promissory note dated October 11, 2001, signed by Kelson, which indicated that Employee would receive $249,331.84 in return for the investment by November 11, 2001.  Employee's other daughter (Daughter) also invested $20,000 in exchange for a promissory note dated October 11, 2001, stating that she would receive $133,332 within thirty days.

¶5    Between October 10 and 12, 2001, Employee called her brother (Brother) to inform him about "getting into an investment" and told him he could get "a pretty good return."  Brother invested $116,000 in exchange for a promissory note signed by Kelson, which was dated October 11, 2001, and indicated that Brother would receive $773,333.33 in return.  Brother understood that he was not investing in the project itself, but that his only involvement was in obtaining the letter of credit.

¶6    Kelson did not inform Employee, Daughter, or Brother about her financial background, which included over thirty civil judgments against her totaling $750,000.  Nor did Kelson inform these individuals that some of the money would be spent on her personal expenses.

¶7    All of the promissory notes indicated that S.D.C. Financial Services would make the payments.  On October 11, 2001, S.D.C. Financial was registered as a limited liability company with the Utah Division of Corporations, and it opened a bank account on the same day.  Kelson was listed as the registered agent and as a member.  After the money secured by the promissory notes was deposited in the S.D.C. Financial account, most of it was transferred to an account in Washington, $5,000 was used for legal fees, and Kelson withdrew approximately $25,000 for her personal use.  When the S.D.C. Financial account was closed in January 2002, it had a negative balance of over $9,000.  The letter of credit was never purchased, and S.D.C. Financial defaulted on its obligations under the promissory notes to Employee, Daughter, and Brother.

¶8 On March 5, 2004, the State charged Kelson with three counts of securities fraud; one count of offer or sale of unregistered securities; one count of sales by an unlicensed broker-dealer, agent or investment advisor; and one count of pattern of unlawful activity.

¶9 At the trial held on February 24 and 25, 2009, the State called the Director of Enforcement (Director) for the Utah Division of Securities (the Division) as a securities expert. Director testified that notes are presumed to be securities and that "unless that presumption is overcome, it remains a security." Director explained that there are certain enumerated categories of notes that are not securities and also stated that there are four factors used to determine whether other notes are not securities (four-factor test or *Reves* test). Director explained how those factors are applied and opined how they might be weighed in this case.

¶10 At the close of evidence, Kelson moved for a directed verdict on all counts. The trial court denied the motion. Earlier, the parties had stipulated to the jury instructions. Instruction 25 states,

> You are instructed that a "note" is presumed to be a security. However, certain notes have been classified as non-securities; these notes are:
> 1. the note delivered in consumer financing,
> 2. the note secured by a mortgage on a home,
> 3. the short-term note secured by a lien on a small business or some of its assets,
> 4. the note evidencing a 'character' loan to a bank customer,
> 5. short-term notes secured by an assignment of accounts receivable, or
> 6. a note which simply formalizes an open-account debt incurred in the ordinary course of business particularly if, as in the case of the customer of a broker, it is collateralized.
> A class of notes that resembles one of these exceptions can be added to the list of non-security notes if they meet a four factor test. That test is to:
> 1. examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it.

> If the seller's purpose is to raise money for the general use of
> a business enterprise or to finance substantial investments
> and the buyer is interested primarily in the profit the note is
> expected to generate, the instrument is likely to be a
> "security." On the other hand, if the note is exchanged to
> facilitate the purchase and sale of a minor asset or consumer
> good, to correct for the seller's cash-flow difficulties, or to
> advance some other commercial or consumer purpose, the
> note is less sensibly described as a "security."
> 2. [e]xamine the "plan of distribution" of the instrument to
> determine whether it is an instrument in which there is
> common trading for speculation or investment.
> 3. [e]xamine the reasonable expectations of the investing
> public, and
> 4. [e]xamine whether some factor such as the existence of
> another regulatory scheme significantly reduces the risk of
> the instrument, thereby rendering application of the
> Securities Acts unnecessary.

¶11 The jury convicted Kelson on all counts. At sentencing, Kelson represented herself and asked the trial court to review certain documents. The trial court refused to receive or review the documents before imposing sentence. Kelson now appeals.


ISSUES AND STANDARDS OF REVIEW


¶12 Kelson first argues that Jury Instruction 25 violated her constitutional right to a presumption of innocence and the constitutional requirement that the State prove every element of the crime beyond a reasonable doubt. Kelson did not preserve this argument in the trial court and asks us to review it under the doctrine of plain error. *See generally State v. Nelson-Waggoner*, 2004 UT 29, ¶ 16, 94 P.3d 186. To establish plain error, Kelson must show that "'(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined.'" *Id.* (quoting *State v. Dunn*, 850 P.2d 1201, 1208-09 (Utah 1993)).

¶13    Kelson also argues that counsel was ineffective for stipulating to this instruction. "We consider ineffective assistance of counsel claims raised for the first time on appeal as a matter of law." *State v. Sellers*, 2011 UT App 38, ¶ 9, 248 P.3d 70.

¶14    Next, Kelson argues that the trial court erred in denying her motion for a directed verdict because it misapplied the Utah Pattern of Unlawful Activity Act. *See generally* Utah Code Ann. §§ 76-10-1601 to -1609 (2008 & Supp. 2011). Whether the trial court properly interpreted the statute is a question of law that we review for correctness. *See State v. Steele*, 2010 UT App 185, ¶ 12, 236 P.3d 161.

¶15    Finally, Kelson argues that the trial court violated her due process rights and rule 22(a) of the Utah Rules of Criminal Procedure when it declined to grant a continuance to allow Kelson to present additional documents to the court. These arguments each present a question of law, "which we review for correctness." *See State v. Wanosik*, 2001 UT App 241, ¶ 9, 31 P.3d 615, *aff'd*, 2003 UT 46, 79 P.3d 937.


ANALYSIS

I.  The Due Process Implications of Jury Instruction 25

¶16    Before analyzing Kelson's claims regarding Jury Instruction 25, we discuss the due process concerns implicated by the instruction. "The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Francis v. Franklin*, 471 U.S. 307, 313 (1985) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). This principle "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Id.* In determining whether a jury instruction relieves the State of this burden, "'[t]he threshold inquiry'" requires that we "'determine the nature of the presumption it describes.'" *Id.* at 313-14 (quoting *Sandstrom v. Montana*, 442 U.S. 510, 514 (1979)). "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts." *Id.* at 314. Mandatory presumptions violate due process "if they relieve the State of the burden of persuasion on an element of an

offense."[3]  *Id.*  In contrast, "[a] permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion."  *Id.*  Permissive inferences do not violate the Due Process Clause because the State is still required "to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved."  *See id.*  Thus, we must first determine whether Jury Instruction 25 created a mandatory or permissive presumption that a note is a security.

¶17    Our analysis of which type of instruction is at issue "must focus initially on the specific language challenged."  *Id.* at 315.  Reviewing that language, we consider "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."[4]  *Estelle v. McGuire*, 502 U.S. 62, 72

---

[3]In *Searle v. Milburn Irrigation Co.*, 2006 UT 16, 133 P.3d 382, the Utah Supreme Court explained that "there are two evidentiary burdens:  a burden of persuasion and a burden of production."  *Id.* ¶ 49 n.2 (citing *Koesling v. Basamakis*, 539 P.2d 1043, 1046 (Utah 1975)).  While the burden of persuasion "refers to '[a] party's duty to convince the fact-finder to view the facts in a way that favors that party,'" the burden of production "refers to '[a] party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling.'"  *Id.* (alterations in original) (quoting *Black's Law Dictionary* 190 (7th ed. 1999)).  The term "burden of proof" "encompasses both the burden of persuasion and the burden of production."  *Id.*

[4]This is a slightly different formulation than set forth by the United States Supreme Court in the seminal cases of *Sandstrom v. Montana*, 442 U.S. 510 (1979), and *Francis v. Franklin*, 471 U.S. 307 (1985).  Several years after those decisions, the Supreme Court in *Boyde v. California*, 494 U.S. 370 (1990), clarified the standard of review for jury instructions.  *See id.* at 378-80 (citing *Franklin*, 471 U.S. at 315-16; *Sandstrom*, 442 U.S. at 516-17) ("Although there may not be great differences among these various phrasings, it is important to settle upon a single formulation for this Court and other courts to employ in deciding this kind of federal question.").  The Court explained that the focus on the "reasonable likelihood that the jury" applied the instruction unconstitutionally, "better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical 'reasonable' juror could or

(continued...)

(1991) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). Here, the challenged instruction states, "You are instructed that a 'note' is presumed to be a security. However, certain notes have been classified as non-securities." The instruction then lists several nonsecurities and describes a four-factor test to determine whether a note not on the list should be considered a nonsecurity. Even if the State is correct that Instruction 25 provides an accurate statement of the law, *see Reves v. Ernst & Young*, 494 U.S. 56, 66-67 (1990) (announcing the four-factor *Reves* test in a civil context); *State v. Burkinshaw*, 2010 UT App 245, ¶ 11 n.3, 239 P.3d 1052 (reviewing the trial court's application of the *Reves* test in a criminal case, "without deciding whether Utah should adopt that test" to determine whether a note is a security); *see also* Utah Code Ann. 61-1-13(1)(ee)(i)(A) (2011) ("'Security' means a . . . note."), it may not supplant the factfinder's role with a mandatory presumption, *see State v. Chambers*, 709 P.2d 321, 325 (Utah 1985) (noting that presumptions in criminal cases may be permissible if they do not supplant "the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt"). In determining whether an instruction has done so, we pay "careful attention to the words actually spoken to the jury." *See Sandstrom*, 422 U.S. at 514.

¶18 The State contends that the presumption in Instruction 25 is permissive because the information that certain notes are not securities and the explanation of the four-part *Reves* test reasonably informed the jury that it could determine that the promissory notes were nonsecurities. However, even assuming that the additional language made the presumption rebuttable, we are not persuaded that it was permissive, rather than mandatory. We consider the United States Supreme Court's decision in *Francis v. Franklin*, 471 U.S. 307 (1985), instructive on this point.

¶19 In *Franklin*, the defendant challenged the following instruction:

> The acts of a person of sound mind and discretion are
> presumed to be the product of the person's will, but the
> presumption may be rebutted. A person of sound mind and
> discretion is presumed to intend the natural and probable

---

⁴(...continued)
might have interpreted the instruction." *See id.* at 380.

> consequences of his acts but the presumption may be
> rebutted.

*Id.* at 315. In holding that the instruction violated the defendant's due process rights by impermissibly shifting the burden of persuasion, the Supreme Court first identified the presumption as mandatory due to the use of command, rather than permissive, language. *Id.* at 316 (determining that the language "are presumed" and "is presumed" commanded the jury to apply the presumption at issue). Next, the *Franklin* court rejected the argument that the defect had been cured by the permissive rebuttal language because

> [t]he very statement that the presumption "may be rebutted"
> could have indicated to a reasonable juror that the defendant
> bore an affirmative burden of persuasion once the State
> proved the underlying act giving rise to the presumption.
> Standing alone, the challenged language undeniably created
> an unconstitutional burden-shifting presumption with
> respect to the element of intent.

*Id.* at 318.

¶20     Instruction 25 is similar to the instruction held to violate the due process clause in *Franklin*. It begins with language of command, stating, "You are instructed that a 'note' is presumed to be a security." The instruction does not state that the jury "may" presume that a note is a security or tell the jurors that they have a choice in whether to follow the presumption. Instead, the words spoken to the jury instruct that "a 'note' is presumed to be a security." Furthermore, unlike the instruction in *Franklin*, Instruction 25 does not expressly state that the mandatory presumption may be rebutted. Even assuming, as the State suggests, that the jury could infer as much from the description of the four-factor test, nothing in Instruction 25 explains that the State, not Kelson, had the burden of proving that these notes were securities. Thus, as in *Franklin*, the jury may have understood that Kelson "bore an affirmative burden of persuasion" once the State established that she had provided notes to Employee, Daughter, and Brother, thereby "giving rise to the presumption." *See id.* at 318.

¶21    However, we may not rely only on the language of Instruction 25 in deciding whether Kelson's due process rights were compromised. Instead, we must consider a reasonable jury's understanding in the context of the jury instructions and the record as a whole. *See McGuire*, 502 U.S. at 72 ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973))).

¶22    "Other instructions [and the record] might explain the particular infirm language to the extent that a reasonable jur[y] could not have considered the charge to have created an unconstitutional presumption." *Franklin*, 471 U.S. at 315; *see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991). In reviewing the other instructions or explanations in the record, we must determine if they sufficiently "explained the proper allocation of burdens . . . [so] that any ambiguity" in the instruction did not result in a reasonable likelihood that the jury would apply the instruction so as to "shift[] the burden of persuasion" to Kelson. *See Franklin*, 471 U.S. at 319. However, "[l]anguage that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Id.* at 322.

¶23    The State argues that there are several clarifying instructions that rectify any deficiencies in Instruction 25. Specifically, the State notes that the jury was repeatedly instructed that the State had the burden of proving beyond a reasonable doubt all the elements of the crime charged. However, the United States Supreme Court has rejected that argument, explaining that

> general instructions on the State's burden of persuasion and the defendant's presumption of innocence are not "rhetorically inconsistent with a conclusive or burden-shifting presumption," because "[t]he jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt . . . could be satisfied."

*See Francis v. Franklin*, 471 U.S. 307, 319 (1985) (alteration in original) (quoting *Sandstrom v. Montana*, 442 U.S. 510, 518 n.7 (1979)). For example, in this case, there is a reasonable

likelihood that the jury could have determined that although the State needed to prove the existence of a security beyond a reasonable doubt, the presence of a promissory note was sufficient to satisfy the State's burden, given its possible conclusion that Kelson did not succeed in rebutting this presumption. *See, e.g., id.* at 319. Thus, these generalized instructions do not clarify the mandatory rebuttable presumption contained in Instruction 25.

¶24   Additionally, the State relies on Instruction 38, which states in relevant part,

> Evidence has been admitted relating to Civil Judgments previously issued against Ms. Kelson. These Judgments are admitted for a very limited purpose. Specifically, *if your deliberations determine that the Promissory Notes involved in this case were proven to be "securities"* you may then consider whether the existence of such Judgments constituted a "material fact" for purposes of the disclosure requirements referenced in other Instructions.
> On the other hand, *if your deliberations determine that the Promissory Notes were not shown to be "securities,"* you must disregard the Judgments entirely.

(Emphasis added.) The State contends that this instruction "impressed upon the jury the State's burden to prove that the notes were securities." However, while this instruction may indicate that the jury must decide whether notes are securities, it does nothing to clarify the burden of persuasion.

¶25   Additionally, the State argues that the State's and Kelson's closing arguments and the testimony of the Director clarified that it was the State's burden to prove that the promissory notes were securities.[5] During closing, the State argued,

---

[5]The State also argues that the court's preliminary jury instructions cured any defect in Instruction 25. As discussed, the fact that the general jury instructions contain statements that the State was required to prove each element of the crime beyond a reasonable doubt is not enough to clarify Instruction 25. *See supra* ¶ 23.

[A]s you look at these promissory notes, you will need to determine, not [Director], not me, you need to determine . . . whether they were securities under the test that you've heard about; but more particularly under the jury instructions that you have in front of you. There's a jury instruction that goes to what we call the *Reves* test. You presume that a promissory note is a security and that is because, if you look at the definitional instruction, it says [w]hat securities are and one of the definitions is [a] note.

And because under the law notes are listed as a security, they are presumed to be securities. But, and you heard the testimony from [Director], that there are certain notes that have been carved out, that don't need to be regulated as securities. . . .

The State then analyzed the facts of the case against the four-factor test, concluding that "[n]otes are presumed to be securit[ies] and this is not one of those ones that gets carved out."

¶26    Despite this lengthy argument about the presumption and the State's repeated mention that the jurors were to apply the four-factor test to determine whether the notes were a security, the State never clarified which party bore the burden of persuasion on that issue. Thus, even with the State's closing argument, the jury reasonably could have interpreted the jury instruction to mean that the presumption shifted the burden to Kelson to prove an exception.

¶27    Nor are we convinced that this confusion was eliminated by Director's testimony. Contrary to the State's assertion, Director did not discuss whether the State or Kelson had the burden of proving or disproving whether the promissory notes were a nonsecurity. Rather, Director explained that the four-factor "test basically says that . . . you accept the presumption that a note is a security, you start with that. And unless that presumption is overcome, it remains a security." Rather than supporting the State's position, Director's testimony reinforced the unconstitutional burden shifting in Instruction 25 because he referred to a presumption that had to be "overcome" in order for the note to be a nonsecurity. Because the State's case was based on the proposition that the promissory notes were securities, it would have no reason to try to "overcome"

the presumption.  Therefore, rather than curing the problem, Director's testimony exacerbated it.

¶28    Only Kelson attempted to clarify the proper burden during closing argument. She argued that the State must prove that the promissory notes were securities beyond a reasonable doubt.  However, even Kelson did not explain that the State could not meet its burden by relying on the mandatory presumption or on Kelson's failure to persuade the jury that the notes met the four-factor test. *Cf. Francis v. Franklin*, 471 U.S. 307, 319 (1985) (rejecting an argument that an instruction explaining that the government had the burden to prove each element of the crime beyond a reasonable doubt cured another instruction containing a mandatory rebuttable presumption).  In its rebuttal argument, the State did not address which party bore the burden on this issue. Instead, it simply reiterated that the jury had the responsibility to decide whether the promissory notes were securities, without explaining the burden of persuasion on the issue.

¶29    Based on our review of the jury instructions and the record as a whole, we are convinced that there is a reasonable likelihood that the jury impermissibly interpreted Instruction 25 as shifting to Kelson the burden of rebutting the mandatory presumption that the promissory notes were securities.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). This was in violation of Kelson's due process rights because the State was "not forced to prove 'beyond a reasonable doubt . . . every fact necessary to constitute the crime . . . charged.'"  *See Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (omissions in original) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).  However, because Kelson failed to preserve this issue below, we will now consider her claim under the doctrine of ineffective assistance of counsel.[6]

## II.  Ineffective Assistance of Counsel Regarding Instruction 25

¶30    Kelson argues that her counsel provided ineffective assistance by stipulating to Instruction 25.  To succeed on this claim, Kelson must establish  "(1) that h[er] counsel performed deficiently, i.e., that counsel's performance 'fell below an objective standard

---

[6]Kelson also asks this court to review this issue under the doctrine of plain error. Because we reverse and remand on Kelson's claim of ineffective assistance of counsel, we need not consider this argument.

of reasonableness,' and (2) that [s]he was prejudiced by h[er] counsel's deficient performance." *See State v. Kucharski*, 2012 UT App 50, ¶ 3, 272 P.3d 791 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 691-92 (1984)), *cert. denied* (Utah June 28, 2012).

A. Deficient Performance

¶31    We first determine whether counsel's conduct was deficient. In evaluating counsel's conduct, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). The State argues that because Kelson's "primary defense to her charges was that the notes here were not securities," Jury Instruction 25 may have aided in this defense, and as a matter of sound trial strategy, defense counsel may have chosen not to object. According to the State, the explanation of the four-factor test and the indication that some notes are not securities was more helpful to the defense than a recitation of the statutory definition of security, which includes notes. *See generally* Utah Code Ann. § 61-1-13(1)(ee)(i) (2011) (indicating that "'[s]ecurity' means a . . . note," without providing any exceptions). While providing this detail may have been advantageous to Kelson if combined with an explanation that the State retained the burden of proving beyond a reasonable doubt that the promissory notes did not qualify as nonsecurities, nothing in the instruction does that. Without that explanation, we cannot agree that it is a sound trial strategy to consent to a jury instruction that informs the jury that "notes are presumed to be securities," when the primary defense is that the notes are not securities. Indeed, we can conceive of no sound tactical reason why trial counsel would stipulate to an instruction that likely shifted the burden of persuasion to Kelson on an essential element of the crimes charged. Accordingly, we conclude that counsel's performance was deficient.

B. Prejudice

¶32    Next, we must determine whether counsel's performance prejudiced Kelson. "'To show prejudice in the ineffective assistance of counsel context, the defendant bears the burden of proving that counsel's errors actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's errors, the result of the

proceeding would have been different.'" *State v. Fowers*, 2011 UT App 383, ¶ 21, 265 P.3d 832 (quoting *State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Lenkart*, 2011 UT 27, ¶ 38, 262 P.3d 1 (quoting *Strickland*, 466 U.S. at 694). In examining counsel's alleged errors, we "'consider the totality of the evidence' to determine whether the errors 'alter[ed] the entire evidentiary picture,'" *id.* (alterations in original) (quoting *Strickland*, 466 U.S. at 695-96), and note that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," *Strickland*, 466 U.S. at 696.

¶33 The State contends that the evidence was overwhelming that the notes were securities and that therefore Kelson has not been prejudiced. While there are instances where an erroneous jury instruction is harmless, we are persuaded that this is not such a case.[7] *Cf. State v. Powell*, 2007 UT 9, ¶ 23, 154 P.3d 786 (holding that an incorrect instruction that intent for murder could include depraved indifference was harmless where the uncontested evidence established the intent to kill and the defendant did not dispute intent, instead claiming that he had been misidentified as the assailant); *Gardner v. SPX Corp.*, 2012 UT App 45, ¶ 38, 272 P.3d 175 (holding that an erroneous proximate cause instruction was harmless where the jury found that there was no negligence, thus completing deliberations before reaching that issue). Here, we have concluded that Instruction 25 created a reasonable likelihood that the jury understood that Kelson bore the burden of rebutting a mandatory presumption that the notes were securities. Because the evidence created a meaningful conflict on that issue, our confidence in the verdict has been undermined by the improper shifting of the burden of persuasion.

¶34 In making this determination, we look to the four-part *Reves* test outlined in Instruction 25, which provides that if a note resembles one of the listed exceptions to the presumption, it may be a nonsecurity if it "meet[s] a four factor test." *See generally Reves v. Ernst & Young*, 494 U.S. 56, 66-67 (1990). In particular, we consider whether the evidence was so overwhelming on those factors that we are confident the jury would have found that the notes were securities, even if properly instructed on the State's burden. *See Strickland*, 466 U.S. at 696; *Lenkart*, 2011 UT 27, ¶ 38; *see also State v. Arnold*,

---

[7]Because Kelson has established prejudice, we need not consider her argument that prejudice should be presumed due to Instruction 25's unconstitutional shifting of the burden of persuasion.

2011 UT App 255U, ¶ 6 (mem.) (holding that where there was overwhelming evidence supporting the defendants' guilt, they could not show that they were prejudiced by their counsel's performance).

¶35 First, Instruction 25 directed the jurors to consider the motivations of the buyer and seller, stating that "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" In contrast, the instruction explained that where a "note is exchanged . . . to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, the note is less sensibly described as a 'security.'"[8] The evidence at trial showed that the notes were to be used to purchase a letter of credit to correct cash-flow difficulties that prevented Kelson and the Owners from closing the transactions. According to Kelson, the purchasers knew the funds were to purchase the letter of credit and, therefore, that they were not for the general use of a business enterprise or to finance a substantial financial investment. However, the testimony of the buyers indicates that they were primarily interested in profit, especially given the substantial return in such a short amount of time.[9] Furthermore, Director opined that the cash flow difficulties in this case might not fall within the *Reves* test and that if the buyer is motivated primarily by profits, the promissory notes are likely securities. Thus, the jury was tasked with determining from this evidence whether the motivations of the buyers and the seller of the notes weighed in favor of finding that the notes were securities. We are convinced that the evidence was conflicting on this point and accordingly determine that the jury may have weighed this factor in favor of Kelson.

---

[8]Instruction 25 also provides that a note "exchanged to facilitate the purchase and sale of a minor asset or consumer good . . . is less sensibly described as a security." Kelson does not argue that this circumstance is present here.

[9]For instance, Daughter and Brother each expected to receive a return of nearly six times their investment over a period of one month. Employee would receive a return of over ten times her investment, also over a period of one month.

¶36    The second *Reves* factor outlined in Instruction 25 tells the jury to "[e]xamine the 'plan of distribution' of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment." In this case, it is undisputed that this factor weighs against classification of the promissory notes as securities because none of the purchasers indicated that they planned to resell the promissory notes. Accordingly, the evidence on this factor is overwhelmingly in favor of Kelson.

¶37    The third *Reves* factor, as set forth in Instruction 25, focuses on "the reasonable expectations of the investing public." The State's expert testified that "if someone in the general public looks at the transaction . . . [and] use[s] the word investment then it is more likely a security than not." At trial, Kelson argued that the buyers were not making an investment because they would own no interest in the real estate project, but were "simply lending money for a short term loan." However, the minimum return promised on the notes was nearly 600% over a one-month period and the buyers referred to them as investments. Accordingly, we believe the evidence on this factor weighs strongly in favor of a finding that the promissory notes are securities.

¶38    Finally, the fourth *Reves* factor instructed the jury to "[e]xamine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." We have not been directed to any evidence of a regulatory scheme here that could support weighing this factor against a finding that the notes are securities.

¶39    Kelson presented evidence from which the jury could have concluded that at least two of the relevant factors weighed in favor of finding that the notes were not securities. Furthermore, the jury was free to weigh the four factors against each other however it deemed appropriate. Thus, the evidence was not so overwhelming in the State's favor that we have confidence in the verdict despite the impermissible shifting of the burden of persuasion created by Instruction 25. Accordingly, Kelson has established that her counsel's ineffective performance in stipulating to Instruction 25 was prejudicial, and we reverse and remand for a new trial on the securities charges.

III.  The Sufficiency of the Evidence to Prove a Pattern of Unlawful Activity

A.  Preservation

¶40    Kelson next contends that the alleged unlawful activity in this case is not a pattern of unlawful activity as a matter of law.  The State contends that Kelson failed to preserve this issue for appellate review.  "In order to preserve an issue for appeal, a defendant must raise the issue before the [trial] court in such a way that the court is placed on notice of potential error and then has the opportunity to correct or avoid the error."  *State v. Diaz-Arevalo*, 2008 UT App 219, ¶ 10, 189 P.3d 85.  In particular, "[t]he issue must be sufficiently raised to a level of consciousness before the trial court and must be supported by evidence or relevant legal authority."  *Id.* (internal quotation marks omitted).

¶41    At the close of evidence on February 25, 2009, Kelson moved for a directed verdict on the pattern of unlawful activity charge.  Kelson asserted that "[a]lthough there are multiple counts in this case, I would argue . . . that there are not multiple episodes, which [are] required under the definition of pattern [of] unlawful activity."  Trial counsel relied on the statutory language and the dictionary definition of episode, because "[t]here wasn't anything in the Utah case law with regard to pattern of unlawful activity."  *See generally* Utah Code Ann. § 76-10-1602(2) (Supp. 2011) (defining "[p]attern of unlawful activity").

¶42    While the State acknowledges that Kelson raised the argument that "the five securities violations here constituted only a single episode of unlawful activity," it argues that Kelson failed to adequately preserve the issue.  In particular, the State contends that Kelson "misinformed the trial court" that there was no Utah authority on this point because she did not call the trial court's attention to the Utah Supreme Court's decision in *Hill v. Estate of Allred*, 2009 UT 28, 216 P.3d 929.  While we agree that *Hill* is controlling, we cannot fault trial counsel for failing to cite it.  The supreme court issued the *Hill* decision on May 1, 2009, approximately two months after the conclusion of Kelson's trial on February 25, 2009.  *See id.*

¶43    Our review of the directed verdict record indicates that Kelson specifically argued to the trial court that "there [were] not multiple episodes, which is required under the definition of pattern for unlawful activity."  In support of this argument,

Kelson stated that "in many . . . cases, there is a pattern of unlawful activity that can stretch on for a long long time, years, sometimes." Kelson asserted that the acts in this case were the result of "a single episode" and thus "did not constitute a pattern as it's commonly understood." While trial counsel did not expressly argue that the predicate acts in this case were not committed over a "substantial period of time," the supreme court had not yet used that language to define a pattern of unlawful activity, as it later did in *Hill*.[10] *See Hill*, 2009 UT 28, ¶ 41 ("The proper test for determining whether there was a pattern of unlawful activity is whether there was 'a series of related predicates extending over a substantial period of time' or a demonstrated threat of continuing unlawful activity and not whether there were multiple schemes." (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989))). Instead, Kelson relied on the definition of "[p]attern of unlawful activity" in Utah Code section 76-10-1602 and the dictionary to support her motion for directed verdict made immediately upon the close of evidence. *See* Utah Code Ann. § 76-10-1602(2). Nor has the State pointed to any Utah authority available at the time of the directed verdict motion that defined the term "episode" for these purposes. Under these circumstances, we are convinced that Kelson sufficiently preserved this issue. *See Diaz-Arevalo*, 2008 UT App 219, ¶ 10.

B. Merits

¶44 The Utah Pattern of Unlawful Activity Act (the Utah Act) defines a "pattern of unlawful activity," in relevant part, as

> engaging in conduct which constitutes the commission of at
> least three episodes of unlawful activity, which episodes are
> not isolated, but have the same or similar purposes, results,
> participants, victims, or methods of commission, or
> otherwise are interrelated by distinguishing characteristics.
> Taken together, the episodes shall demonstrate continuing

---

[10]The State also contends that Kelson never argued in her appellate brief that her acts did not extend over a substantial period of time. However, Kelson specifically outlines the test provided in *Hill v. Estate of Allred*, 2009 UT 28, 216 P.3d 929, including the substantial period of time element. *See id.* ¶ 41. Immediately thereafter, Kelson distinguishes this case from *Hill*, stating, "[T]he conduct alleged in counts one through five occurred during a period of just a few days."

> unlawful conduct and be related either to each other or to
> the enterprise.

Utah Code Ann. § 76-10-1602. Kelson argues that under this definition, her crimes can only constitute a single criminal episode because although there were multiple acts and multiple victims, each act sought to accomplish the same objective over a short period of time. In contrast, the State argues that under *Hill*, multiple acts which "contribute[] to the same objective" can be considered multiple criminal episodes. *See* 2009 UT 28, ¶ 40. While we agree in principle with the State's interpretation of the law, we determine that the predicate acts in this case do not constitute multiple episodes as defined in *Hill*. *See id.* ¶ 41.

¶45 In *Hill*, the plaintiff filed a complaint asserting a civil pattern of unlawful activity on the ground that "each unlawful act by [d]efendants" was a separate "episode of unlawful activity," constituting a pattern. *See id.* ¶ 35. In contrast, the defendants argued that, although not accomplished through a single act, their conduct "was only one episode of criminal activity." *See id.* The district court agreed with defendants, and the plaintiffs appealed. *See id.*

¶46 In interpreting the Utah Act, the supreme court compared the federal Racketeer Influenced and Corrupt Organizations Act (RICO), *see generally* 18 U.S.C. §§ 1961-68 (2006), with Utah Code section 76-10-1602(2), *see generally* Utah Code Ann. § 76-10-1602(2) (Supp. 2011). *See Hill*, 2009 UT 28, ¶¶ 38-40. It determined that the phrases "pattern of unlawful activity" under section 76-10-1602(2) and "pattern of racketeering activity" under RICO "should be interpreted to mean the same thing." *Id.* ¶ 38. Accordingly, the Utah Supreme Court applied United States Supreme Court precedent interpreting RICO to determine the meaning of "pattern of unlawful activity" under Utah's Act. *See id.* ¶¶ 38-40. Relying on *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), and the legislative history of the Utah Act, our supreme court determined that a "pattern of unlawful activity" under the Utah Act requires "'continuity plus relationship.'" *See Hill*, 2009 UT 28, ¶ 38 (quoting *Sedima*, 473 U.S. at 496 n.14) (internal quotation marks omitted); *see also* Utah Code Ann. § 76-10-1602(2) ("Taken together, the episodes shall demonstrate continuing unlawful conduct and be related either to each other or to the enterprise."). To define "continuity plus relationship," the court looked to *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989). *See Hill*, 2009 UT 28, ¶ 39. There, the United States Supreme Court held that "'to prove a pattern of

racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.'" *See Hill*, 2009 UT 28, ¶ 39 (quoting *H.J.*, 492 U.S. at 239). The *H.J.* court further clarified that "'[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'" *See Hill*, 2009 UT 28, ¶ 39 (quoting *H.J.*, 492 U.S. at 241). The Utah Supreme Court further reasoned that "[c]ontinuity may be demonstrated 'over a closed period by proving a series of related predicates extending over a substantial period of time,' and if a RICO action is 'brought before continuity can be established in this way,' continuity can be shown if 'the threat of continuity is demonstrated.'" *See id.* (quoting *H.J.*, 492 U.S. at 242). Although not mentioned in *Hill*, the *H.J.* court further explained that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *See H.J.*, 492 U.S. at 242.

¶47     After analyzing these cases, our supreme court concluded that "[t]he proper test for determining whether there was a pattern of unlawful activity is whether there was 'a series of related predicates extending over a substantial period of time' or a demonstrated threat of continuing unlawful activity and not whether there were multiple schemes." *See Hill v. Estate of Allred*, 2009 UT 28, ¶ 41, 216 P.3d 929 (quoting *H.J.*, 492 U.S. at 242). The *Hill* court then applied that test to the facts, explaining that each of the defendants' unlawful acts served the same purpose of stealing Hill's money, involved similar parties, and involved the same victim. *See id.* It further noted that the unlawful acts occurred over a five-year period. *See id.* ¶ 41. Based on those facts, the *Hill* court concluded that the defendants' acts constituted a pattern of unlawful activity. *See id.*

¶48     The facts in this case are distinguishable from *Hill*. Although Kelson's actions involved multiple alleged crimes committed for the common purpose of obtaining cash, Kelson's alleged crimes took place over a matter of days. Kelson first alerted Employee about the opportunity shortly before October 11, 2001, and all checks exchanged for promissory notes were deposited by October 15, 2001. Thus, Kelson's alleged unlawful activity took place over a "closed period," and the State was required to show "'a series

of related predicates extending over a substantial period of time.'"[11] *See Hill*, 2009 UT 28, ¶ 41 (quoting *H.J.*, 492 U.S. at 242). The State does not contend that it has done so, nor could it have made such a showing.[12] As the Supreme Court noted in *H.J.*, "[p]redicate acts extending over a few weeks or months," which do not threaten "future criminal conduct," do not constitute a substantial period of time sufficient to show continuity. *See H.J.*, 492 U.S. at 242. Accordingly, Kelson's acts over the course of only a few days are insufficient as a matter of law to satisfy *Hill*'s requirement that a pattern of unlawful activity must occur over a substantial period of time.[13] *See Hill*, 2009 UT 28, ¶ 41. Thus, the trial court erred in denying Kelson's motion for a directed verdict and we vacate Kelson's conviction on the charge of pattern of unlawful activity.[14]

---

[11]On appeal, the State makes no allegation that Kelson's conduct posed a continuing threat of unlawful activity. *See Hill*, 2009 UT 28, ¶ 41.

[12]Rather than arguing that Kelson's acts extended over a substantial period of time, the State analyzes this issue under the doctrine of plain error. It concludes that Utah law is unclear on what constitutes a substantial period of time, and thus determines that any error was not plain. We need not determine whether it is plain that several days does not constitute a substantial period of time because Kelson adequately preserved this issue.

[13]The State calls our attention to the Utah Supreme Court's decision in *State v. McGrath*, 749 P.2d 631 (Utah 1988), where a defendant was convicted of racketeering based on seventy-four drug transactions occurring over a four-month period. *Id.* at 636. We do not consider *McGrath* inconsistent with our decision here. While the drug sales occurred over only four months, the high volume of transactions "'by its nature projects into the future with a threat of repetition.'" *See generally Hill*, 2009 UT 28, ¶ 39 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989)). As indicated, *supra* note 11, in this case the State makes no allegation that Kelson's acts posed a continuing threat of unlawful activity.

[14]Because we reverse Kelson's conviction on this count and reverse and remand for a new trial on the charges of offer or sale of unregistered securities; sale by an unlicensed broker-dealer, agent, or investment advisor; and securities fraud, we need not consider Kelson's challenge to her sentences under rule 22(a) of the Utah Rules of Criminal Procedure.

CONCLUSION

¶49    Jury Instruction 25 created a mandatory rebuttable presumption that a note is a security, thereby unconstitutionally shifting the burden of persuasion from the State to Kelson.  In stipulating to this instruction, Kelson's counsel performed deficiently. Because the evidence was not overwhelming on at least two of the four factors relevant to whether the promissory notes here were securities, this deficiency prejudiced Kelson. Additionally, the trial court erred in denying Kelson's motion for a directed verdict with respect to the pattern of unlawful activity charge because her activities do not constitute a pattern of unlawful activity as a matter of law.  We vacate Kelson's conviction for pattern of unlawful activity and reverse and remand for a new trial on the charges of offer or sale of unregistered securities; sale by an unlicensed broker-dealer, agent, or investment advisor; and securities fraud.

¶50    Vacated in part, and reversed and remanded in part.


_____
Carolyn B. McHugh,
Presiding Judge


-----


¶51    WE CONCUR:


_____
Gregory K. Orme, Judge


_____
James Z. Davis, Judge