*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2014 UT 38**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Petitioner,*

*v.*

GRACE C. KELSON,
*Defendant and Respondent.*

No. 20120843
Filed September 19, 2014

Third District, Salt Lake
The Honorable Judith S.H. Atherton
No. 041901548

On Certiorari to the Utah Court of Appeals

Attorneys:

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Att'y Gen.,
Salt Lake City, for petitioner

Alan S. Mouritsen, Nicole G. Farrell, Scott S. Bell,
Salt Lake City, for respondent

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the Court:

¶1    Grace Kelson was convicted of five securities law violations and one count of maintaining a pattern of unlawful activity (racketeering) related to an investment scheme. The court of appeals overturned Kelson's securities convictions on the basis of ineffective assistance of trial counsel in stipulating to a jury instruction that purportedly relieved the State of its burden to prove each element of the charges beyond a reasonable doubt.

¶2　We reverse. We conclude that the jury instruction in question was an accurate statement of the underlying criminal law and not a burden-shifting evidentiary presumption. We accordingly reject Kelson's claims of ineffective assistance of counsel and plain error, and thus reinstate her five securities law convictions.

I

¶3　Kelson met Mark and Todd Mosher, owners of a mortgage company, in 1999. At that time Kelson was working on two purported property developments—one in Heber City, Utah, and the other in Brazil. She approached the Moshers about helping to secure funding for the projects, and they agreed. Between 1999 and 2001, the Moshers met with 20 to 30 potential lenders but were ultimately unable to secure loans for the projects. Faced with insufficient funding, Kelson and the Moshers sought to obtain a letter of credit to fund the Brazilian project. The letter of credit was to serve as collateral for potential lenders, thereby making it easier to find parties willing to fund the project. Kelson and the Moshers needed approximately $125,000 to secure a $15 million letter of credit.

¶4　To that end, they set about persuading friends and colleagues, and the families of their friends and colleagues, to provide funds for the letter of credit. The deal was pitched as a short-term investment with little to no risk and the potential for very high returns. In exchange for funding the letter of credit, the investors received promissory notes signed by Kelson for amounts several times larger than the amounts they provided. Kelson and the Moshers did not register the promissory notes as securities or obtain licenses to sell them.

¶5　The promissory notes stated that they would be paid within thirty days by S.D.C. Financial Services, a limited liability company of which Kelson was the registered agent. S.D.C. was created and registered as a limited liability company on the date the promissory notes were executed, and opened its first bank account that same day. Over the course of several days, the money secured by the promissory notes was deposited in the S.D.C. bank account. Most of it was then transferred to an account in the state of Washington. Of the money that remained in the S.D.C. account, $5,000 was used for legal fees, and Kelson withdrew another $25,000 for her own personal use, which included clothing, gro-

ceries, personal care, trips to hair salons, furniture, and a down payment on a condominium. Kelson did not inform the holders of the promissory notes that their money would be used for her personal expenses.

¶6 Ultimately, Kelson failed to obtain the letter of credit and S.D.C. defaulted on its obligations under the promissory notes. When the S.D.C. bank account was closed a few months later, it had a negative balance of approximately $9,000.

¶7 The State charged Kelson with three counts of securities fraud; one count of offering or selling unregistered securities; one count of sales by an unlicensed broker-dealer, agent, or investment advisor; and one count of engaging in a pattern of unlawful activity. At trial, Kelson did not dispute that she had issued the promissory notes. Her primary defense was that the promissory notes did not constitute "securities" under Utah law.

¶8 The parties stipulated to jury instructions, one of which outlined the process for the jury to determine whether the promissory notes were securities. Instruction 25 stated:

> You are instructed that a "note" is presumed to be a security. However, certain notes have been classified as non-securities; these notes are:
>
> 1. the note delivered in consumer financing,
> 2. the note secured by a mortgage on a home,
> 3. the short-term note secured by a lien on a small business or some of its assets,
> 4. the note evidencing a "character" loan to a bank customer,
> 5. short term notes secured by an assignment of accounts receivable, or
> 6. a note which simply formalizes an open-account debt incurred in the ordinary course of business particularly if, as in the case of a customer of a broker, it is collateralized.

The instruction then explained that a class of notes that "resembles one of these exceptions can be added to the list of non-security notes if [it] meet[s] a four factor test."

¶9 Instruction 25 then delineated a four-part test. Under that test the jury was directed first to "examine the transaction" to de-

termine whether "the seller's purpose [was] to raise money for the general use of a business enterprise or to finance substantial investments," in which case the note would likely be deemed a security. Alternatively, the jury was to consider whether the note "facilitate[d] the purchase of a minor asset or consumer good[,] . . . correct[ed] cash-flow difficulties[,] . . . [or] advanced some other commercial or consumer purpose," in which case the note was "less sensibly described as a security." Next the jury was to determine whether the note was an instrument "in which there is common trading for speculation and investment," and "examine the reasonable expectations of the investing public." And finally, the jury was to examine whether another factor such as "the existence of another regulatory scheme" reduced the risk of the instrument and "thereby render[ed] application of the Securities Act unnecessary."

¶10 Kelson was convicted on all six counts and appealed. The court of appeals reversed Kelson's five securities law convictions, holding that her counsel rendered ineffective assistance by stipulating to instruction 25 because that instruction (specifically, its language establishing a presumption that a note is a security) impermissibly shifted the burden to Kelson and relieved the State of its burden to prove each element of an offense beyond a reasonable doubt.[1] *See State v. Kelson*, 2012 UT App 217, ¶ 49, 284 P.3d 695. The State filed a petition for certiorari, which we granted.

¶11 On certiorari, we review the decision of the court of appeals, not the underlying decision of the trial court. The appellate court's decision merits no deference in our analysis, although the correctness of the court of appeals' decision may turn in part on whether it accurately reviewed the trial court's decision under an appropriate standard of review. *See State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673.

II

¶12 The threshold question presented concerns the viability of the jury instruction's statement that "a 'note' is presumed to be a security." Kelson contends, and the court of appeals held, that this

---

[1] The court of appeals also vacated Kelson's conviction for pattern of unlawful activity, *see State v. Kelson*, 2012 UT 217, ¶ 48, 284 P.3d 695, but the State does not challenge that part of the decision.

presumption effectively relieved the prosecution of its burden of proof on an element of the securities crimes with which she was charged, running afoul of the principles set forth in *Francis v. Franklin*, 471 U.S. 307, 313 (1985), and *In re Winship*, 397 U.S. 358, 363 (1970). *State v. Kelson*, 2012 UT App 217, 284 P.3d 695. And in light of this alleged defect in the instruction, the court of appeals agreed with Kelson's assertion that her counsel was ineffective in failing to object to it.

¶13 The State's response is twofold. It first defends the instruction as accurately reflecting a presumption prescribed by statute, Utah Code section 61-1-13(24)(a)(i)(A) (2000)—a provision that in the State's view obviates the principles in *Francis* and *Winship* and therefore excuses counsel's failure to object to the instruction in question. And second, the State defends counsel's failure to object on an alternative basis—that the instruction was actually *more favorable* to the defense than that prescribed by statute, in that the instruction incorporated limiting principles from *Reves v. Ernst & Young*, 494 U.S. 56 (1990), that are not set forth in the statute.

¶14 We uphold the instruction as an accurate statement of law that does not implicate the burden-shifting concerns reflected in *Francis* and *Winship*. On that basis we reverse the court of appeals' determination of defense counsel's ineffectiveness in failing to object to instruction 25, and decline to address the State's alternative ground for defending counsel's performance. Finally, we reject Kelson's plain error argument, as there was no plain error in the adoption of this stipulated instruction.

A

¶15 *Winship* established the now-familiar principle that due process requires proof beyond a reasonable doubt "of every fact necessary to constitute the crime with which [one] is charged." 397 U.S. at 364. *Francis* extended that "axiomatic and elementary . . . principle" to foreclose the operation of burden-shifting evidentiary presumptions that have the effect of relieving the prosecution of its burden of proof on an essential element of a crime. 471 U.S. at 315–18.

¶16 The presumption at issue in *Francis* arose in the context of a crime of "malice murder" (murder committed with "malice aforethought"). *See Francis*, 471 U.S. at 310 n.1. Although the underlying substantive criminal law required not just proof of the *actus*

*reus* of homicide but the *mens rea* of intent, the jury instruction in question had the effect of relieving the State of its burden of proving the latter. It did so by operation of a presumption that a person is "presumed to intend the natural and probable consequences of his acts." *See id.* at 315.[2]

¶17 The *Francis* court found that presumption to run afoul of due process. It held that due process "prohibits the State from using *evidentiary presumptions in a jury charge* that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis*, 471 U.S. at 313 (emphasis added). And it found that principle to be implicated by the above-noted instruction, as it effectively eliminated the requirement of proof of intent beyond a reasonable doubt—by the presumption establishing the *mens rea* element upon proof of the *actus reus*. *See id.* at 316 (explaining that the instruction runs afoul of due process principles because it "directs the jury to presume an essential element of the offense—intent to kill—upon proof of other elements of the offense—the act of slaying another").

¶18 The fatal flaw in the instruction in *Francis* was its distortion of the substantive law of intentional homicide. That underlying law set forth two independent elements—of *actus reus* and *mens rea*—and left no room for a presumption collapsing the two. Thus,

---

[2] The full jury instruction at issue in *Francis* read: "A crime is a violation of a statute of this State in which there shall be a union of joint operation of act or omission to act, and intention or criminal negligence. A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking or intention or criminal negligence. The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted. A person will not be presumed to act with criminal intention but the trier of facts, that is, the Jury, may find criminal intention upon a consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is prosecuted." 471 U.S. at 311–12.

the defect in the *Francis* instruction was its creation of an evidentiary presumption out of whole cloth—a presumption that had no basis in the substantive criminal law and that therefore shifted the burden of proof on an element assigned by the criminal law to the prosecution.

¶19 The presumption at issue here did no such thing. It in no way altered or undermined any element of the substantive law. To the contrary, the presumption accurately reflected that law, which defines a "security" to include "any note." UTAH CODE § 61-1-13(24)(a)(i)(A) (2000).[3] The presumption in instruction 25 thus steered clear of the due process concern in *Francis*, as it in no way shifted the burden of proof on an element assigned by the criminal law to the prosecution.

¶20 The legislature has the discretion to define the elements of a crime as it sees fit. In so doing, it is not at all foreclosed from employing the terminology or concept of a *presumption*. The moral of *Francis* is not that presumptions are generally suspect as elements of criminal jury instructions; it is that they must not be used in a manner that shifts the burden of proof on an element assigned by the criminal law to the prosecution.[4]

---

[3] The statute underwent subsequent amendments, which were primarily stylistic. Kelson was charged under the 2000 version, so we cite it here.

[4] *See People v. McCall*, 82 P.3d 351 (Cal. 2004) (upholding jury instruction under statute criminalizing possession of certain chemicals with intent to manufacture methamphetamine—which stated that "possession of immediate precursors sufficient for the manufacture of [] hydriodic acid [] shall be deemed to be possession of the derivative substance"—because that presumption in instruction was "nothing more than a definitional section that specified [criminal] conduct," and "lawmakers [have] broad power to select the elements of crimes, and to define one thing in terms of another"); *People v. Pinkston*, 112 Cal. App. 4th 387, 391–92 (2003) (upholding jury instruction under statute defining evasion of peace officer as a felony where "pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property," including "driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are

¶21 Even in the law of murder, there is no general due process ban on the invocation of a presumption. The law of felony murder incorporates a presumption, and in so doing raises no due process concern. Thus, although the state generally must prove intent to sustain a conviction for murder, our law presumes intent where a homicide is committed in the course of a felony. *See* UTAH CODE § 76-5-203(2)(d). The adoption of that presumption falls well within the legislature's judgment in defining the elements of a crime. And for that reason a jury instruction reflecting it would be perfectly acceptable as a matter of due process.

¶22 The same conclusion holds for the securities crimes at issue here. The governing statute is in the form of a presumption—in defining "security" in terms of general rules and exceptions. *See* UTAH CODE § 61-1-13(24)(a)&(b) (2000). And the instruction at issue accurately reflected the statute in establishing a presumption that a note is a security.

¶23 That conclusion foils Kelson's claim for ineffective assistance of counsel. Kelson's counsel could reasonably have stipulated to instruction 25 as an accurate statement of law that in no way shifted the burden of proof through an evidentiary presumption. We reverse on that basis. *See Nicholls v. State*, 2009 UT 12, ¶ 37, 203 P.3d 976 (defendant has burden to show counsel's performance "fell below an objective standard of reasonableness" (citing *Strickland v. Washington*, 466 U.S. 688 (1984))).

B

¶24 In so doing, we decline to address the State's alternative basis for defending counsel's effectiveness—its assertion that counsel's performance could be defended on the ground that instruction 25 was arguably *more favorable* to the defense than the standard prescribed by statute, such that an objection to the instruction might have produced a clarification that would have hurt Kelson's cause. This alternative argument compared the statutory text with the terms of the instruction. Whereas the statute seems to categorically equate a "security" with a "note," the State

---

assigned a traffic violation point count under [statute] occur, or damage to property occurs"; concluding that definition established a rule of law "rather than a presumption apportioning the burden of persuasion" on an element of the crime).

noted that the instruction framed the matter in terms of a presumption subject to rebuttal—under exceptions and factors apparently incorporating the federal definition of security set forth in *Reves v. Ernst & Young*, 494 U.S. 56, 61–65 (1990).[5]

---

[5] *Reves* interpreted the federal definition of "security" in the 1934 Securities Act, 15 U.S.C. § 78c(a)(10). Although the statutory definition broadly defined "security" as "any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement," the *Reves* court concluded that the 1934 Act did not establish a "broad federal remedy for all fraud,'" but was aimed instead at fraud in connection with "investments." *Reves*, 494 U.S. at 61 (internal quotation marks omitted). Thus, the *Reves* court held that the 1934 Act did not literally extend to all transactions encompassing literally all "notes," but rather left it to the SEC and to the courts "to decide which of the myriad financial transactions in our society come within the coverage of these statutes." *Id.* (internal quotation marks omitted).

Extending a body of caselaw followed in some of the lower courts to have addressed this issue, the *Reves* court adopted a presumption that "every note is a security," while allowing for rebuttal of the presumption by a showing that the note falls into one of seven categories more closely resembling consumer or commercial loans than investments. *Reves*, 494 U.S. at 64–65 (recognizing exceptions for (1) a "note delivered in consumer financing;" (2) "a note secured by a mortgage on a home;" (3) a "short-term note secured by lien on a small business or some of its assets;" (4) a "note evidencing a 'character' loan to a bank customer;" (5) a short-term note "secured by an assignment of accounts receivable;" (6) "a note which simply formalizes an open-account debt incurred in the ordinary course of business;" and (7) a note "evidencing loans by commercial banks for current operations"). In addition, the *Reves* court identified four factors of relevance to determining whether a note bears a "strong resemblance" to one of these categories. *Id.* at 66–67 (indicating that the relevant factors are (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction];" (2) "the plan of distribution of the instrument;" (3) "the reasonable expectations of the investing public;" (4) "whether some factor such as the existence of another

¶25 The distinction between the statutory text and the terms of the instruction may be more apparent than real. The *Reves* standard could be understood to represent a settled, term-of-art understanding of the definition of a security. And if so it might be possible to read the Utah statute as incorporating that established understanding. *See Maxfield v. Gary Herbert,* 2012 UT 44, ¶ 31, 284 P.3d 647 (noting that when a word or phrase is transplanted from another legal source, it may be interpreted to bring its "old soil with it"); *State v. Burkenshaw,* 2010 UT App 245, ¶ 11 n.3, 239 P.3d 1052 (reviewing trial court's application of the *Reves* test in a criminal case, "without deciding whether Utah should adopt that test" to determine whether a note is a security). But we need not and do not resolve this question here. We rest our decision instead on the conclusion that instruction 25 was not an evidentiary presumption unlawfully shifting the burden of proof to the defense but an accurate statement of Utah law.[6]

C

¶26 The above analysis of instruction 25 defeats Kelson's plain error claim as well. Because the instruction is not a burden-shifting evidentiary presumption but a correct statement of Utah law, there can be no error—much less plain error—in the district court's acceptance of the parties' stipulated instruction. *See State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993) (plain error "is not established" unless error is "obvious"). We accordingly reject Kelson's assertion of plain error and therefore reinstate the securities convictions entered against her in the district court.

---

regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Act unnecessary").

[6] Our holding also obviates Kelson's take on the *Reves* factors set forth in the instruction—that those factors reinforced the burden-shifting impact of the instruction's presumption. She says they did so by telling the jury "that it should infer notes are securities unless the defendant persuaded the jury that such an inference was unwarranted." That may be, but again that is not by operation of a burden-shifting evidentiary presumption, but only as an accurate statement of the substantive law.