2007 OK CIV APP 2

**TOWN OF WELLSTON,**
**Plaintiff/Appellant,**

v.

**Kevin W. WALLACE and Angela Wallace, Husband and Wife, and James R. Jackson, Jr., Defendants/Appellees.**

No. 102,504.

Court of Civil Appeals of Oklahoma, Division No. 1.

Dec. 15, 2006.

James J. Hodgens, Hodgens & Burleson, P.A., Stroud, OK, for Plaintiff/Appellant,

Miles C. Zimmerman, Zehra Jaffrey, Chandler, OK, for Defendants/Appellees.

CAROL M. HANSEN, Judge.

¶ 1 Plaintiff/Appellant, Town of Wellston, Oklahoma (Town), seeks review of the trial court's order determining there were no issues left for resolution following its denial of Town's motion for summary judgment in its action to enjoin a zoning violation. We affirm because Town failed to show it complied with statutory prerequisites for exercising zoning power.

¶ 2 Town sued Kevin Wallace and Angela Wallace (Owners), seeking an injunction to prevent them from operating the subject property as commercial property in violation of Town's zoning ordinances. Owners answered and counterclaimed for damages. Town moved to add James Jackson as a party defendant, alleging Owners had conveyed the property to him. Town then moved for summary judgment, asserting Owners' property was zoned residential but Owners had placed commercial vehicles, fencing, buildings, and other appurtenances on the property without obtaining building permits, zoning changes, or variances. Town asserted that after construction on the property was substantially complete, Owners applied for a building permit and zoning variance. Town asserted its "City Council acting in its capacity as its Planning Commission" denied the request.

¶ 3 Town stated it had ordinances creating a planning commission and board of adjustment, but according to the affidavit of its mayor, "Town ... at all relevant times in these proceedings, has not had a town planning commission or a board of adjustment due to the fact that individuals have been unwilling to serve in such a capacity." Town argued its governing body, the Board of Trustees, was vested with the power to grant and deny zoning variances, as well as the power to hear appeals of zoning variance denials.

¶ 4 In response, Owners contended they were entitled to a variance, but Town violat-ed their due process rights when the Board of Trustees acted on their application in the absence of a board of adjustment. Owners argued Town had no power to enact and enforce zoning regulations in the absence of a planning commission. They asserted the structures on their property were not a threat to public health or safety, and Town was not entitled to an injunction because it had failed to show the act sought to be enjoined would injure Town.

¶ 5 The trial court denied Town's motion for summary judgment, ruling "[w]ithout a board of adjustment there was no body to appeal to or from that would invoke the jurisdiction of this Court." After the parties sought clarification, the trial court entered an order determining "there are no issues left for resolution," and acknowledging Owners' dismissal in open court of their counterclaim. Town appeals from this order.

¶ 6 The trial court's order had the effect of refusing an injunction. Therefore, it is a final, appealable order pursuant to 12 O.S.2001 § 952(b)(2).

¶ 7 Municipalities are authorized to enact zoning regulations to promote the health, safety, morals, or the general welfare of the community. 11 O.S.2001 § 43–101. However, "[i]n order to avail itself of [zoning] powers ..., the municipal governing body shall appoint a commission to be known as the zoning commission to recommend the boundaries of the various original districts and to recommend appropriate regulations to be enforced therein." § 43–109. In addition, "[w]here a municipality is exercising zoning powers, ... the governing body of the municipality shall provide by ordinance for the appointment of a Board of Adjustment." § 44–101. The powers of the board of adjustment include hearing and deciding (1) appeals of decisions made by an administrative official in the enforcement of any zoning ordinance, (2) special exceptions to zoning ordinances, and (3) variances from the terms, standards and criteria pertaining to an allowed use category within a zoning district. The municipality's power to enact zoning ordinances is legislative, while the board of adjustment's power is adjudicative in nature. *Vinson v. Medley,* 1987 OK 41, 737 P.2d 932,

936. Pursuant to these statutes, a municipality must have both a zoning commission and board of adjustment in order to exercise its zoning authority. It may not do so in their absence.

■ ¶ 8 The proscription against dual office holding does not apply to municipal officers serving on a municipal board or commission "except where the duties of the offices or positions conflict." 51 O.S.Supp.2004 § 6. While there might be no conflict in a board of trustees member serving as a planning commission member, there is a clear conflict in such an officer serving on the board of adjustment which hears appeals of decisions made by other municipal officers. Therefore, a member of the board of trustees may not serve on the board of adjustment. By failing to have a board of adjustment, Town has failed to comply with statutory prerequisites for exercising zoning power and is not entitled to an injunction under the current circumstances in this case.

¶ 9 Accordingly, the trial court's order is AFFIRMED.

BELL, P.J., and JOPLIN, J., concur.

2006 UT 87

**STATE of Utah, Plaintiff and Petitioner,**

v.

**Brooks BRADSHAW, Defendant and Respondent.**

No. 20040975.

Supreme Court of Utah.

Dec. 29, 2006.

Mark L. Shurtleff, Att'y Gen., Charlene Barlow, Christine F. Soltis, Asst. Att'ys Gen., Salt Lake City, for plaintiff.

Joan C. Watt, Robert K. Heineman, Salt Lake City, for defendant.

NEHRING, Justice:

## INTRODUCTION

¶ 1 Representing himself as an owner of a mortgage company, Brooks Bradshaw assured his fourteen victims that he could help them refinance their current mortgages. After collecting fees from his victims, Mr. Bradshaw disappeared.

¶ 2 Mr. Bradshaw was charged with eleven counts of communications fraud.[1] The district court concluded that Mr. Bradshaw's defraudation of his fourteen victims was part of a single "scheme or artifice." As such, Mr. Bradshaw was exposed to conviction for eleven second degree felonies under Utah's communications fraud statute, Utah Code Ann. § 76–10–1801 (2003), despite the fact that the amount of money Mr. Bradshaw took from each individual or couple would have made Mr. Bradshaw culpable for only a class A misdemeanor offense. The divided court of appeals rejected the district court's interpretation. We conclude that the district court's interpretation was correct and reverse the court of appeals.

## BACKGROUND

¶ 3 Mr. Bradshaw waived his right to a preliminary hearing. Instead, Mr. Bradshaw and the State stipulated to the facts and asked the district court to determine whether those facts supported a bindover on eleven counts of second degree felony communications fraud. The district court concluded that they did.[2] According to the stipulated facts, over the course of approximately three months, Mr. Bradshaw targeted and then defrauded fourteen persons of monies ranging from $400 to $600, ultimately accumulating a total of $5,400. In each instance, Mr. Bradshaw targeted persons who were trying to refinance a mortgage on a residence or were trying to acquire a loan to avoid foreclosure. Mr. Bradshaw met with his victims in their homes. He falsely represented himself as either an owner or a co-owner of a mortgage company and assured his victims that he would refinance their current mortgage for a fee. He told them that the fees would be used to compensate him for his services and to obtain appraisals, title searches, and credit reports. Mr. Bradshaw never performed any of the promised services, and his

---

1. Although there were fourteen victims, Mr. Bradshaw was charged with only eleven counts because three of the fraudulent acts involved couples.

2. The district court also bound over Mr. Bradshaw on one count of racketeering in violation of Utah Code section 76–10–1603. That charge does not concern us here.

victims were never able to locate him after he departed with their money.

¶ 4 At times, Mr. Bradshaw's method of operation varied among his victims. For example, on one occasion, Mr. Bradshaw brought an associate who claimed to be an appraiser to meet with a victim. On another occasion, he offered to purchase a victim's store. He also offered to help acquire financing for a "real estate project [a victim] was attempting to complete."

¶ 5 The State charged Mr. Bradshaw with eleven counts of second degree felony communications fraud because it considered Mr. Bradshaw's eleven acts of guile to be part of a single "scheme." The State insisted that if Mr. Bradshaw defrauded all fourteen victims through a single scheme, two provisions of the communications fraud statute came into play: one that designated each communication made for the purpose of executing or concealing the scheme as a separate offense and another that measured the degree of each separate offense by totaling the amount of money obtained from the "scheme or artifice." Utah Code Ann. § 76-10-1801(2), (5) (2003). Because the State considered Mr. Bradshaw's eleven fraudulent acts to be part of a single "scheme or artifice," it accumulated the amounts Mr. Bradshaw took from his victims—a total of $5,400—and used that amount to determine that the degree of the eleven offenses was second degree felonies.

¶ 6 Mr. Bradshaw moved to quash his bindover on the felony communications fraud charges. He contended that he had defrauded his fourteen victims through eleven separate, individual schemes. Therefore, he argued, it would be improper to aggregate the amounts taken from the victims for the purpose of fixing the degree of the offense and then disaggregate the fraudulent acts so that he could be charged with eleven more serious offenses. Mr. Bradshaw asserted that, under a proper reading of the communications fraud statute, he should face, at most, eleven

class A misdemeanors or one second degree felony.

¶ 7 The district court denied Mr. Bradshaw's motion, and Mr. Bradshaw entered into a plea agreement. He pled guilty to four counts of attempted communications fraud—third degree felonies under section 76-4-102(3)—and reserved the right to appeal the district court's denial of his motion. The district court accepted the pleas, and the remaining charges were dropped. Mr. Bradshaw then appealed the district court's order on his motion to quash, and the court of appeals reversed the district court. The State sought certiorari review, which we granted to consider whether the court of appeals properly interpreted the communications fraud statute when it held that Mr. Bradshaw's fraudulent activities were not separate parts of a single scheme.[3]

## ANALYSIS

¶ 8 The issue at hand calls upon us to interpret Utah's communications fraud statute and apply it to accepted facts. We proceed without deferring to the interpretation of the statute adopted by the court of appeals' majority. *John Holmes Constr., Inc. v. R.A. McKell Excavating, Inc.,* 2005 UT 83, ¶ 6, 131 P.3d 199. We hold that conduct which qualifies as a "scheme or artifice" under the communications fraud statute may involve multiple acts, actors, and victims. The acts, however, must share a sufficient number of common elements to permit a reasonable person to conclude that they were part of a single criminal design.

¶ 9 As noted above, the question of whether multiple fraudulent acts are part of a single scheme or are, instead, separate criminal episodes is a matter of great importance in the application of the communications fraud statute. The communications fraud statute provides that each communication made in furtherance of a scheme to defraud constitutes a separate offense. Utah Code Ann. § 76-10-1801(5) (2003). The statute

---

3. In Mr. Bradshaw's brief, he contends that subsections (2) and (5) of the Utah communications fraud statute must be read in the alternative or be declared unconstitutional. On appeal below, the court of appeals rejected this argument. Mr. Bradshaw failed to raise this issue on a cross-petition for certiorari, and we did not grant certiorari on this issue. It is, therefore, improperly before us, and we decline to consider it. *See State v. South,* 924 P.2d 354, 355-56 (Utah 1996).

also directs that the severity of each separate offense be determined by the aggregate of the monies obtained or sought to be obtained by the "scheme or artifice." *Id.* § 76–10–1801(2). The statute does not, however, offer further guidance on how to identify a "scheme or artifice."

¶ 10 The court of appeals' majority concluded that the term "scheme or artifice" as used in the communications fraud statute was ambiguous. It justified this conclusion by drawing on United States Supreme Court commentary on the " 'highly elastic' " nature of the term. *State v. Bradshaw,* 2004 UT App 298, ¶ 17, 99 P.3d 359 (Thorne, J., dissenting) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 241 n. 3, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). We have no quarrel with this characterization of "scheme" or with the Supreme Court's observation that the term is " 'hardly self-defining.' " *Id.* (quoting *H.J. Inc.,* 492 U.S. at 241 n. 3, 109 S.Ct. 2893). We are not persuaded, however, that definitional elasticity is synonymous with ambiguity. Nor are we convinced, even in the absence of definitional precision, that a court is free to immediately apply more generalized principles of statutory interpretation—like the rule of lenity or relevant public policy considerations—without first exploring whether a reliable definition of the term may be ascertained from authoritative extra-textual sources. While public policy considerations and the rule of lenity impose limitations on definitions, they illuminate definition indirectly. Our first inquiry should be into sources of guidance on the actual meaning of the term itself.

¶ 11 The term "scheme or artifice" is an established term of art that has been repeatedly defined in state and federal cases throughout the country. Indeed, the Utah communications fraud statute borrowed the term from the federal mail and wire fraud statutes. Floor Debate, 46th Leg., Gen. Sess. (Utah Feb. 27, 1985) (Senate recording no. 129) (statements of U.S. Attorney for Utah Brent Ward) ("The language of the bill is based on the federal mail and wire fraud statutes. These statutes have withstood the test of almost 100 years [of] experience."). Other courts' interpretations of that term, therefore, are instructive and aid us in our efforts to interpret the Utah statute.

¶ 12 We find that the term scheme "refers to the overall design to defraud one or many by means of a common plan or technique." *United States v. Massey,* 48 F.3d 1560, 1566 (10th Cir.1995). A single scheme can include a series of separate but similar fraudulent acts, as long as the separate acts are linked by a common, continuing criminal design.

¶ 13 The court of appeals held that a single scheme could not include criminal activity where victims are deceived "at different times, in different places, by different stories, and through different methods." *Bradshaw,* 2004 UT App 298, ¶ 20, 99 P.3d 359. While this interpretation would treat the defrauding of multiple victims as a single scheme if the fraudulent misrepresentation or omission were made at one time and in one place to a single group of people, *id.* ¶ 20 n. 7, we nevertheless find too limiting the court of appeals' emphasis on commonality of time and place. A series of fraudulent acts aimed at obtaining one criminal objective clearly constitutes a single scheme, but so does a series of similar fraudulent acts separated by time and place but linked by a common, continuing criminal design. *See State v. Fleming,* 225 Mont. 48, 730 P.2d 1178, 1180 (1987) (defining, by statute, a " 'common scheme' ... as a series of acts or omissions motivated by a purpose to accomplish a single criminal objective *or by a common purpose or plan which results in the repeated commission of the same offense* or affects the same person or the same persons or the property thereof" (emphasis in original) (citations and internal quotation marks omitted)). We find this statement by the Fifth Circuit helpful:

[T]he defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme.... [I]t does not make any difference that the various deceptions were practiced at different places. Nor is it significant that the whole scheme was not planned out in advance. A continuing "intention to devise it," ... or an imperfectly conceived plan to defraud which be-

comes more and more sophisticated and grandiose as the plan progresses and the assets of the more gullible victims are exhausted, may well constitute a single scheme.

*Owens v. United States*, 221 F.2d 351, 354 (5th Cir.1955) (quoting *Weiss v. United States*, 122 F.2d 675, 680 (5th Cir.1941)). Thus, the fact that schemers may alter slightly their methodology or effect the fraud on various victims at different times is not conclusive evidence that the separate acts of fraud are separate schemes. *See United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002) (Cowen, J., dissenting) ("By itself, changing the method used to commit a fraud does not inaugurate a new fraudulent scheme."). The execution of a plan may result in infinite operational differences, but so long as the conduct at the operational level can reasonably be considered part of the common plan, it does not constitute a separate, independent scheme.

■ ¶ 14 A "scheme or artifice" connotes calculation or planning. Forming a series of deceitful acts into a common scheme requires forethought. A scheme cannot be executed on impulse. The incorporation of forethought into the definition of a scheme means that the presence of several identical criminal acts would be insufficient to establish the existence of a scheme without evidence of planning, foresight, or coordination. Thus, a series of identical criminal acts may not qualify as the product of a single "scheme or artifice" if each act is independently impulsive. This would be true irrespective of whether the acts were committed at about the same time, in the same place, involved similar conduct, and touched victims who met a common profile. In this way, the existence and nature of the forethought that precedes the criminal conduct has much to do with whether that conduct is part of a scheme. The proper focus, then, is on the level of generality of the plan behind the criminal act, which is what sets schemes apart from unrelated criminal conduct.

■ ¶ 15 By directing our attention to the criminal plan's level of generality for the purpose of determining the existence of a "scheme or artifice," we do not intend to disagree with the Fifth Circuit's view that a single scheme may incorporate both an incompletely formulated plan and later deceptions whose evolution may be traced to a primordial fraudulent plan. Nor do we intend to limit the consideration of other factors that may be relevant to the finding of a common scheme. To this end, we find that (1) similarity of method, *United States v. Maker*, 751 F.2d 614, 625 (3d Cir.1984);[4] (2) similarity of result, *id.*; (3) frequency and duration of the fraudulent acts, *United States v. Zemek*, 634 F.2d 1159, 1168 (9th Cir.1980); (4) commonality of time and goals, *id.*; and (5) commonality of victim profiles are all factors that courts may consider when determining whether a series of fraudulent acts are part of a single "scheme or artifice." Evidence of common operational techniques such as these would provide clear evidence that a defendant was acting within the designs of a calculated plan. By contrast, a common scheme would not be present where the evidence demonstrates that the common features of the conduct are superficial and that the separate acts of fraud were impulsive and not premeditated.

¶ 18 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.