**2019 UT App 113**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LAMONT BOYD SQUIRES,
Appellant.

Opinion
No. 20161032-CA
Filed June 27, 2019

Fourth District Court, Provo Department
The Honorable Fred D. Howard
No. 121400198

Clemens A. Landau, Troy L. Booher, and Freyja R.
Johnson, Attorneys for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES KATE APPLEBY and DIANA HAGEN concurred.

POHLMAN, Judge:

¶1 Lamont Boyd Squires, on behalf of his employer, convinced his uncle (Uncle) to pledge real property as collateral for a loan to be used as part of a larger financial transaction. After the transaction failed and Uncle's collateral was lost, Squires was charged with and convicted of communications fraud and a pattern of unlawful activity. Squires appeals, contending that his trial counsel was constitutionally ineffective for not objecting to jury instructions for communications fraud and for not making a hearsay objection. He also contends that there was insufficient evidence to convict him of engaging in a pattern of unlawful activity. We conclude that his counsel

was not ineffective and therefore affirm his communications fraud convictions. We reverse, however, Squires's conviction for engaging in a pattern of unlawful activity and remand with instructions to enter a judgment of acquittal on this count.

BACKGROUND[1]

*The Transaction*

¶2     Squires was a construction manager for Fitz Roy LLC, a real estate investment company that also built "spec" houses.[2] Squires oversaw the construction process, while his boss, Stephen Anderson, lined up investors for projects and exclusively handled the company's finances. During the financial crisis of 2008, Anderson learned of a "really good opportunity" to buy distressed developments in the Teton Valley, finish them, and sell them for a profit. To get funding to pursue this project, Anderson contacted Dincom, a lender. Dincom was willing to loan approximately $10 million, paid in monthly million-dollar disbursements, but required a $660,000 cash deposit.

¶3     Squires knew Fitz Roy did not have enough money for the cash deposit, but he also knew that Uncle had

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *Mackin v. State*, 2016 UT 47, ¶ 2 n.1, 387 P.3d 986 (cleaned up).

2. Spec houses are "built without preexisting construction contracts in anticipation of eventual sale to the public." *Shell v. Schollander Co.*, 369 P.3d 1101, 1102 (Or. 2016).

unencumbered property that could help secure the loan. Wanting to become a partner in Fitz Roy, Squires told Anderson about Uncle, and the two devised a plan. Squires subsequently contacted Uncle early in 2008 with a proposal to use Uncle's property as collateral for a hard money loan, which in turn would be used as the $660,000 deposit for the Dincom loan. Squires promised Uncle that the first disbursement from Dincom would be used to free his property. According to Squires, Fitz Roy would need Uncle's property for "two to three weeks at the most," though Squires knew that ninety days was standard in the industry. In addition, Squires told Uncle that Fitz Roy would pay him a fee for use of his property.

¶4     Squires and Uncle did not talk about the transaction's possible risks. Uncle said that he needed "to get some more information," but he wanted to help his nephew because "[i]n [their] family [they] help each other." He was under the impression that Fitz Roy was "flourishing," even though it "didn't have that much free cash," and understood that, under Squires's proposal, the $660,000 deposit would be kept in escrow in case the Dincom loan did not fund and, if it did, the "very, very first payment was supposed to . . . free up [his] property." Squires guaranteed to Uncle "over and over again" that there "would be nothing to worry about."

¶5     Over the next few weeks, Uncle looked into the deal. He contacted the escrow company handling the transaction and also asked a neighbor experienced in international trading about the process. Uncle, however, found himself needing to address a pressing family concern and told Squires to use another option to get the funding. Despite having told Uncle that Fitz Roy had other alternatives for obtaining funding, Squires now told Uncle that they had no other options and the investors were threatening to back out. Uncle testified at trial that Squires pressured him and said they "had to make

a decision quick." Uncle thought, "[W]ell, okay, I guess I'm going to have to stay with it."

¶6     In late March, Uncle and Anderson signed the necessary paperwork. Uncle testified that he "didn't really have time" to look at the documents and trusted Squires "that everything was going to be taken care of." The documents provided that repayment of the hard money loan for $660,000 would be due in ninety days—not two to three weeks as Uncle had been told. The documents also provided that in exchange for the use of Uncle's property as collateral, Fitz Roy would pay Uncle $100,000, with 25% paid immediately and the rest due in ninety days. Fitz Roy also agreed to provide Uncle with a construction loan so that he could construct a new building on his property. After signing the papers with Anderson, Uncle was again promised, this time by Dincom representatives, that it would "only take two weeks" for the loan to fund.

¶7     After three weeks and still no word from Squires, Uncle called Squires "to see if everything was done." Squires told Uncle that Dincom could not finance the whole loan, so Fitz Roy was securing other options to get the total amount of money it needed. In fact, the day before Dincom's first disbursement was due, a Dincom employee called Anderson with a request to change the loan's terms. After first demanding a return of the $660,000 in escrow, Anderson renegotiated the loan, accepting an initial disbursement of roughly half the original agreed-upon amount. Squires knew that Anderson was working with Dincom and "that there was a hiccup" in funding the loan. In a conversation with Uncle, Squires told Uncle that "it's taking a little longer [than expected] but everything's fine." He did not tell Uncle that they had received a disbursement from Dincom or that the amount of the disbursement was less than originally anticipated.

¶8    Anderson did not put any of the partial disbursement toward repaying the hard money loan secured by Uncle's property. Because there were "other obligations that [he] had to pay," and because he had ninety days to pay the hard money loan, Anderson's plan was to conduct business as usual. He made payments for, among other things, credit cards, business materials, and Squires's salary, and also transferred funds to "personal accounts."

¶9    By this time, Uncle had started construction on his new building, and Squires helped him with the engineering. Uncle frequently called Squires about construction, but the discussion often turned to the loan. Squires told Uncle that "everything's fine, it's moving along," assuring him that "things were going just exactly like [Squires and Anderson] promised."

¶10    In May, Fitz Roy continued looking for additional funding, and it used some of the Dincom money for investment opportunities. Anderson wired $200,000 to an investment trader to obtain more money, and another $104,000 to the escrow company on the Dincom loan to obtain a loan from investors in Seattle. Fitz Roy lost the $104,000, and most of the $200,000 was returned by the trader and sent to Dincom "to stimulate Dincom into fulfilling" the loan agreement. Also during this time, Anderson "talked extensively" with Dincom trying to convince it to fund the loan. Dincom made no disbursement in May or June. Squires knew that Anderson was pursuing other funding and that Dincom did not disburse funds in June, though he thought Dincom made a disbursement in May.

¶11    Construction on Uncle's building proceeded, and Uncle was ready to order trusses. Uncle had money on a line of credit he was saving "just in case they didn't get the money" from Dincom, but he also needed to order the trusses so they would arrive on time. He asked Squires whether he needed to save that money or whether he could order the trusses, and Squires told

him, "[G]o ahead and keep spending the money." Uncle was "constantly contacting" Squires about the loan, and Squires responded that "everything's fine." Squires also told Uncle that the hard money lender was cooperating and not charging extra fees because it "kn[ew] the situation" they were in.

¶12 By July, now several months out from entering the loan, "the story was getting a little more complicated." Dincom informed Anderson that it could not fund the loan and sent $290,000 to Fitz Roy and told Anderson to treat it as a return of escrow. Anderson protested, but there was nothing he could do because "Dincom was going under." In an attempt to salvage what he could, Anderson used $250,000 to acquire a loan from another investment company. That loan "ended up being [a] scam," and Anderson lost the money.

¶13 Squires knew that Dincom had returned some of the escrow money and had discussed the potential loan with Anderson. Around this time, Squires told Uncle that Fitz Roy had $5 million in a bank account but that it was "complicated." Squires, at Anderson's direction, presented a letter to Uncle showing that there was $5 million in the bank account, but Squires later learned that the letter was forged. After the ninety days to repay the hard money lenders had passed, Squires "realized that something was really going wrong." As things got more complicated, Squires told Uncle to talk directly with Anderson. Through August, Uncle and Squires did not talk.

¶14 Things changed in September when the hard money lender called Uncle and told him it was foreclosing on his property. According to Uncle's trial testimony, the hard money lender informed Uncle that Squires had not "been communicating with [it]" and that Squires had "spent the money back in May and [had not] been telling the truth." Uncle asked Squires about his conversation with the lender, and Squires got "pretty angry" and told him, "[E]verything's okay, everything's

safe and secure and it's just a bunch of lies." Squires said that "people go bankrupt all the time" and made Uncle feel that Squires "was chewing [him] out for not being a man." Uncle apologized.

¶15 Uncle and his family eventually sat down with Squires and Anderson to talk about what had happened. Uncle believed the "deposit was still supposed to be safe and secure," so he asked Squires about it. Squires told him that Fitz Roy spent the money on "cabinets and carpet."

¶16 Uncle lost his property. He was forced to sign it over to his brother and another nephew, who purchased the property to save it from foreclosure. Uncle also had to sell his house because of a $300,000 debt on his line of credit that he could not afford. The deal was "exactly opposite of everything that [Squires] had promised."

*Procedural History*

¶17 The State charged Squires with five counts of communications fraud and one count of a pattern of unlawful activity.[3] *See* Utah Code Ann. § 76-10-1801 (LexisNexis 2017) (communications fraud); *id.* § 76-10-1603 (pattern of unlawful activity). A jury convicted Squires on four of the five communications fraud counts and on the pattern of unlawful activity count. The court sentenced Squires to a prison term not to exceed fifteen years on each count, suspended the sentence, and placed him on probation. It also ordered Squires to pay court-ordered restitution of $30,000, though Squires stipulated that the complete restitution amount was $400,000.

---

3. Anderson was also charged with the same counts and pleaded guilty to a third degree felony.

¶18    Squires filed a motion to arrest judgment and a motion for a new trial, both of which challenged the jury instructions and the sufficiency of the evidence.[4] The trial court denied the motions.

¶19    As for the jury instructions, the court rejected Squires's argument that communications fraud requires specific intent to defraud. The court noted that the statute itself "specifies the mens rea required—a person may be convicted for communications fraud if 'the pretenses, representations, promises, or material omissions made or omitted were made or omitted intentionally, knowingly, or with a reckless disregard for the truth.'" (Quoting Utah Code section 76-10-1801(7).) Reasoning that the statute recognizes "knowingly" and "recklessly" as mental states, the court determined that Squires "mistakenly concludes [c]ommunications [f]raud to be a specific intent crime." The court also rejected the argument that the word "devise" in the statute "connotes a specific intent to defraud." It concluded that "it is possible for a person to knowingly or recklessly form, plan, invent, or calculate a scheme or artifice to obtain money, property, etc., from another without having specific intent to defraud." So concluding, and having examined the jury instructions as a whole, the court determined that the jury was properly instructed.

¶20    As for the sufficiency of the evidence on the pattern of unlawful activity charge, the trial court noted that the statute requires "'three episodes of unlawful activity, which episodes are not isolated, but have the same or similar . . . characteristics.'" (Quoting Utah Code section 76-10-1602(2).) Relying on the four communications fraud counts on which

---

4. New counsel represented Squires in his pursuit of post-trial relief. Squires relied on the doctrine of manifest injustice to argue errors in the jury instructions. *See* Utah R. Crim. P. 19(e).

Squires was convicted, the court concluded Squires "engaged in at least three separate but related episodes of unlawful activity." *See* Utah Code Ann. § 76-10-1602(4)(hhhh) (listing communications fraud as an example of unlawful activity). The court also concluded that there was "sufficient evidence at trial that [Squires] was engaged in an enterprise," as required by the statute. It noted that Squires worked for Fitz Roy, communicated to Uncle in his capacity as Fitz Roy's construction manager, and made "repeated misrepresentations" to obtain Uncle's property on Fitz Roy's behalf. The court also rejected Squires's assertion that an enterprise "must be an ongoing association *for the purpose of engaging in a course of unlawful activity*." (Emphasis in original.) Relying on Utah caselaw, the court concluded that "an enterprise is simply an ongoing organization functioning as a continuing unit for the purpose of engaging in a course of conduct."

¶21 The trial court therefore denied Squires's motions and sustained his convictions. Squires appeals.

## ISSUES AND STANDARDS OF REVIEW

¶22 Squires contends that his trial counsel was constitutionally ineffective for not objecting to certain jury instructions on communications fraud. He also contends that trial counsel was constitutionally ineffective for not objecting to what he characterizes as Uncle's hearsay statements at trial. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Ott*, 2010 UT 1, ¶ 16, 247 P.3d 344 (cleaned up).

¶23 Finally, Squires contends that the trial court erred in denying his motion to arrest judgment and motion for a new trial because the evidence at trial was insufficient to convict him of a pattern of unlawful activity. "When the [trial] court denies a motion to arrest judgment and for a new trial, we review that

decision for an abuse of discretion, but we review the legal standards applied by the [trial] court in denying such a motion for correctness." *State v. Newton*, 2018 UT App 194, ¶ 18, 437 P.3d 429 (cleaned up), *cert. granted*, 437 P.3d 1249 (Utah 2019).

## ANALYSIS

### I. Ineffective Assistance of Counsel

¶24 Squires contends that his trial counsel was constitutionally ineffective in two ways: (A) he failed to object to the jury instructions on communications fraud and (B) he failed to object to out-of-court statements as hearsay.

¶25 To demonstrate ineffective assistance of counsel, Squires must show that his "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As should be obvious from a two-part test, "a failure to prove either element defeats the claim." *State v. Horvath*, 2018 UT App 165, ¶ 30, 436 P.3d 191 (cleaned up). Thus, if we conclude that Squires's counsel was not deficient, we need not address prejudice. *Cf. State v. Reid*, 2018 UT App 146, ¶ 19, 427 P.3d 1261 ("Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always address both prongs." (cleaned up)).

¶26 "'Judicial scrutiny of counsel's performance [is] highly deferential' and includes a strong presumption that counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *State v. Reigelsperger*, 2017 UT App 101, ¶ 92, 400 P.3d 1127 (quoting *Strickland*, 466 U.S. at 689–90). Counsel is not required "to seek resolution of every unsettled legal question that might bear on the proceeding" or "to make every novel argument" that new

counsel for the defendant might fashion on appeal. *Id.* "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Strickland*, 466 U.S. at 687.

A.    Communications Fraud

¶27    Utah's communications fraud statute criminalizes false or fraudulent communications, including material omissions, that are made "for the purpose of executing or concealing [a] scheme or artifice" "to defraud another or to obtain from another . . . anything of value." Utah Code Ann. § 76-10-1801(1), (7) (LexisNexis 2017).[5] Squires's main theory at trial and on appeal is that he did not intend to defraud Uncle. Rather, Squires asserts that he wanted the transaction to succeed. He thus contends that to "avoid the over-criminalization of failed transactions" the communications fraud statute requires the State to prove specific intent to defraud. He also contends that the fraud must relate to a "presently existing fact." Because, in Squires's view, the jury instructions in his case did not inform the jury on these important concepts, he asserts that his trial counsel was constitutionally ineffective in not objecting to the instructions or requesting different ones.[6] We address each argument in turn.

---

5. Because the statutory provision in effect at the relevant time does not differ in any material way from the provision now in effect, we cite the current version of the Utah Code.

6. Squires nominally advances arguments under the plain error and manifest injustice doctrines. The State counters that although Squires introduces these doctrines, he never applies them to his claim, "focusing instead exclusively on ineffective assistance." Squires does not rebut this argument. We therefore examine his claim exclusively through the ineffective assistance of counsel lens.

1.     Specific Intent to Defraud

¶28     Squires argues that the communications fraud statute requires specific intent to defraud and, to support his position, points to the statute's use of the legal term of art "scheme or artifice." Relying on the statute's language, Utah caselaw, and analogous federal law, Squires asserts that "'no reasonable lawyer would have found an advantage' in failing to properly identify 'scheme or artifice' and its relationship to intent to defraud." (Quoting *State v. Barela*, 2015 UT 22, ¶ 27, 349 P.3d 676.)

¶29     "To establish a claim of ineffectiveness based on an oversight or misreading of law, a defendant bears the burden of demonstrating why, on the basis of the law in effect at the time of trial, his or her trial counsel's performance was deficient." *State v. Dunn*, 850 P.2d 1201, 1228 (Utah 1993). We conclude that Squires's interpretation of the statute is not dictated by its plain language and that neither Utah nor federal caselaw settles the question. Thus, trial counsel was not deficient in not insisting on other language in the jury instructions. *See State v. Bruun*, 2017 UT App 182, ¶¶ 68, 72–75, 405 P.3d 905 (declining to deem counsel ineffective in deciding not to move for dismissal of certain counts when neither state nor federal law was settled on the issue); *State v. Edgar*, 2017 UT App 53, ¶ 18, 397 P.3d 670 ("Counsel cannot be faulted for failing to advance a novel legal theory which has never been accepted by the pertinent courts." (cleaned up)).

¶30     First, the plain language. The communications fraud statute provides:

> (1) Any person who has devised any scheme or
>     artifice to defraud another or to obtain from
>     another money, property, or anything of value
>     by means of false or fraudulent pretenses,

> representations, promises, or material
> omissions, and who communicates directly or
> indirectly with any person by any means for the
> purpose of executing or concealing the scheme
> or artifice is guilty of:
>
> . . .
>
> (d) a second degree felony when the value of
> the property, money, or thing obtained or
> sought to be obtained is or exceeds $5,000 . . . .

Utah Code Ann. § 76-10-1801(1) (LexisNexis 2017). Subsection (7) further provides that a "person may not be convicted under this section unless the pretenses, representations, promises, or material omissions made or omitted were made or omitted intentionally, knowingly, or with a reckless disregard for the truth." *Id.* § 76-10-1801(7).

¶31 Under the plain language of section 76-10-1801, there are, at least arguably, two types of intent that may establish communications fraud: intent either (1) "to defraud another *or*" (2) "to obtain from another money, property, or anything of value by means of" fraudulent statements or omissions. *See id.* § 76-10-1801(1) (emphasis added); s*ee also State v. Norris*, 2007 UT 6, ¶ 17, 152 P.3d 293. Squires insists that the "State's burden of proof is the same whether it is charging a scheme or artifice to defraud or a scheme or artifice to obtain money or property." But this "is to disregard what 'or' customarily means." *See Loughrin v. United States*, 573 U.S. 351, 357 (2014); *see also State v. Martinez*, 896 P.2d 38, 40 (Utah Ct. App. 1995) (describing "or" as a disjunctive particle that is used to "delineate[] alternative ways" a defendant can be criminally liable).

¶32 The State charged Squires under the second variant— Squires hatched a plan with Anderson to use Uncle's property,

and Squires executed that plan by means of fraudulent statements and omissions. Importantly, under this variant, the State still has to prove a criminal mens rea. Subsection (7) requires that the "pretenses, representations, promises, or material omissions made or omitted were made or omitted intentionally, knowingly, or with a reckless disregard for the truth." Utah Code Ann. § 76-10-1801(7). Thus, under the second variant, the statute requires proof that Squires devised a scheme or artifice to obtain money and then lied or omitted necessary information to carry out the scheme or artifice, but it does not necessarily require proof of Squires's specific intent to defraud. Because a plausible plain reading of the statute supports the district court's instruction, trial counsel was not constitutionally deficient in failing to insist on other instructions.[7]

¶33   Second, Utah caselaw. No authoritative case has settled the issue here, namely, whether both variants of communications fraud require that the actor harbor specific intent to defraud. Squires points to three cases that he asserts support requiring an intentional mens rea for communications fraud. Because "the instructions presented to the jury failed to include this essential *mens rea* for the 'scheme or artifice' element," Squires contends that his trial counsel was ineffective

---

7. Squires's challenge to the jury instructions is viewed through the lens of ineffective assistance of counsel, and thus we need not definitively resolve what the statute actually means. We decide only that because specific intent to defraud is not plainly required to prove the second variant of communications fraud, Squires's trial counsel was not deficient in not insisting otherwise. *Cf. State v. Brocksmith*, 2018 UT App 76, ¶ 16, 424 P.3d 1122 ("[A] defendant is not deprived of the effective assistance of counsel merely because his attorney does not advance every conceivable non-frivolous argument.").

in not objecting to them. None of the cases Squires cites, however, establish that his trial counsel was constitutionally deficient.

¶34   In *State v. Stringham* (*Stringham I*), 957 P.2d 602 (Utah Ct. App. 1998), this court reversed a conviction for communications fraud because the trial court failed to instruct the jury on the applicable mens rea. *Id.* at 608–09. But in that case, we reversed because the jury instructions failed to give "the mens rea requirement embodied in subsection (7) of the statute." *Id.* at 608. We rejected the argument that "the jury divined that [the] defendant had to act intentionally because such a level of volition is inherent in the concept of 'devising a scheme.'" *Id.* at 609 (cleaned up). Yet we required nothing more than what subsection (7) provides. *See id.* at 608–09. As explained, subsection (7) requires that a defendant's fraudulent statements or omissions be "made or omitted intentionally, knowingly, or with a reckless disregard for the truth." Utah Code Ann. § 76-10-1801(7). And the jury instructions here, as opposed to those in *Stringham I*, copied subsection (7) nearly word for word.

¶35   Next, in *State v. Bradshaw*, 2006 UT 87, 152 P.3d 288, the supreme court held that the term "scheme or artifice" is "an established term of art" that "refers to the overall design to defraud one or many by means of a common plan or technique." *Id.* ¶¶ 11–12 (cleaned up). But even if the court's single reference to a "design to defraud" would lend support to the argument that both variants of communications fraud require specific intent, it does not clearly settle the issue such that trial counsel here was constitutionally deficient in not arguing for a specific-intent instruction.[8]

---

8. This court in *State v. Stringham* (*Stringham II*), 2001 UT App 13, 17 P.3d 1153, mentioned "intent to defraud" in an explanatory

(continued…)

¶36    Finally, in *State v. Bird*, 2015 UT 7, 345 P.3d 1141, the supreme court explained that jury instructions "must identify the mens rea implicated by the statutory language, must include a mens rea for all elements, and must distinguish between general and specific intent." *Id.* ¶ 17. That does not answer, however, whether communications fraud requires *specific* intent to defraud. *Cf. id.* ¶ 22. The *Bird* court confronted a similar problem in determining whether the "attempt to flee or elude" element of a failure-to-respond charge required intent or some lesser mental state. *Id.* ¶ 23 (cleaned up). It concluded that "an 'attempt to flee or elude' requires an intentional mental state." *Id.* It reasoned that the "act of fleeing or eluding requires a conscious decision to escape or avoid" and that "one could not recklessly flee from a peace officer." *Id.* But not so here. Indeed, we agree with the trial court that "it is possible for a person to knowingly or recklessly form, plan, invent, or calculate a scheme or artifice to obtain money, property, etc., from another without having specific intent to defraud." Therefore, Utah's caselaw does not clearly establish that communications fraud requires specific intent to defraud such that Squires's trial counsel was constitutionally deficient in this case.

¶37    Third, federal caselaw. Squires directs us to federal cases in which courts have "interpreted the phrase 'scheme or artifice' to require proof of specific intent." The State points out in rebuttal that the federal law is not settled in its own right. We agree with the State.

¶38    Utah's communications fraud statute is modeled after the federal mail and wire fraud statutes. *See Bradshaw*, 2006 UT 87,

---

(…continued)
parenthetical to a case from the Second Circuit. *Id.* ¶ 19. Again, this fleeting reference does not establish that communications fraud in both variants requires the specific intent to defraud.

¶ 11. Our supreme court has said that federal law may be "instructive . . . in our efforts to interpret the Utah statute." *Id.*; *see also Utah Stream Access Coal. v. Orange St. Dev.*, 2017 UT 82, ¶ 21, 416 P.3d 553 (explaining that a legislature's "use of an established legal term of art incorporates the cluster of ideas" surrounding the term (cleaned up)). And some federal courts interpret the phrase "scheme or artifice" in the mail fraud statutes to require specific intent to defraud. *See, e.g., United States v. McNeive*, 536 F.2d 1245, 1247 (8th Cir. 1976). But the United States Supreme Court more recently rejected a specific-intent requirement for bank fraud, another statute modeled after the mail fraud statute with strikingly similar language to Utah's communications fraud statute. *Loughrin v. United States*, 573 U.S. 351, 356–57, 359–60 (2014). There are, of course, differences between the communications fraud statute and the bank fraud statute, just as there are differences between the communications fraud statute and the mail fraud statute. What those differences mean in this case, however, is not clear. Accordingly, Squires's trial counsel was not constitutionally deficient in not unraveling this knot in federal law.

¶39    In sum, given the unclear state of the law, Squires cannot demonstrate that his trial counsel was constitutionally deficient in not objecting to the jury instructions or requesting different ones. *See State v. Bruun*, 2017 UT App 182, ¶¶ 68, 72–75, 405 P.3d 905.

2.    Presently Existing Fact

¶40    Squires also argues that the "instructions failed to advise the jury that a defendant must be reckless about the truth of a 'presently existing fact.'" He exclusively cites *civil* cases to support the proposition that fraud must relate to presently existing facts. True enough, the civil standard provides that

> a misrepresentation of intended future performance is not a representation concerning a "presently existing fact" upon which a claim for fraud can be based unless [the plaintiff] can prove that [the defendant], at the time of the representation, did not intend to perform the promise and made the representation for the purpose of deceiving [the plaintiff].

*Republic Group, Inc. v. Won-Door Corp.*, 883 P.2d 285, 292 (Utah Ct. App. 1994). We conclude, however, that Squires's trial counsel was not constitutionally deficient in not arguing to import the civil standard for fraud into the jury instructions for criminal fraud.

¶41 As explained, "counsel cannot be faulted for failing to advance a novel legal theory which has never been accepted by the pertinent courts." *State v. Edgar*, 2017 UT App 53, ¶ 18, 397 P.3d 670 (cleaned up). Here, Squires fails to direct us to a single criminal case adopting the civil standard for fraud. More importantly, in enacting Utah Code section 76-10-1801, the legislature chose various ways in which an individual could commit the second variant of communications fraud. Section 76-10-1801 lists "false or fraudulent pretenses, representations, promises, or material omissions" as ways to perpetrate communications fraud. There is no indication in the statute that the legislature imported the civil standard for fraud requiring a "presently existing fact." Ultimately, we need not and do not decide whether the statute incorporates the civil standard. We note only that it is Squires's burden to demonstrate "why, on the basis of the law *in effect at the time of trial*, his . . . trial counsel's performance was deficient." *State v. Dunn*, 850 P.2d 1201, 1228 (Utah 1993) (emphasis added). Without any support in caselaw or the plain language of the statute, Squires has not demonstrated deficient performance here. We therefore reject his challenge to the jury instructions.

B.  Hearsay

¶42  Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement and is generally inadmissible at trial. Utah R. Evid. 801(c); *id.* R. 802. Squires contends that his counsel was constitutionally ineffective for not objecting on hearsay grounds to testimony from Uncle about what the hard money lender told him. Uncle testified at trial that the hard money lender called him and said that Squires had not "been communicating with [it]" and that he "spent the money back in May and [had not] been telling the truth." Uncle then testified that after hearing this, he called Squires and related what the lender had said, to which Squires replied it was "just a bunch of lies" and that "people go bankrupt all the time." No objection was made by Squires's trial counsel, and the trial court gave no limiting instruction. Whether or not Uncle's testimony constituted inadmissible hearsay, we conclude that counsel's decision not to object was an exercise of professional judgment that does not amount to deficient performance.

¶43  "When viewing the variety of circumstances faced by defense counsel, a conscious choice not to object to arguably inadmissible testimony may, at times, fall within the range of legitimate decisions regarding how best to represent a criminal defendant." *State v. Gray*, 2015 UT App 106, ¶ 44, 349 P.3d 806 (cleaned up). Particularly when trial testimony is unanticipated and brief, trial counsel may "reasonably . . . believe[] it ill-advised to call undue attention" to the testimony. *State v. Harper*, 2006 UT App 178, ¶ 25, 136 P.3d 1261; *see also State v. Reid*, 2018 UT App 146, ¶¶ 45–47, 427 P.3d 1261 (noting that trial counsel was not deficient in not objecting to hearsay statements when the testimony was "unexpected, brief, and corrected by the prosecutor").

¶44  Here, Uncle's testimony about the hard money lender's out-of-court statement was both unanticipated and brief. The

prosecutor asked Uncle an unobjectionable question—"how were you feeling about the loan by September?"—and specifically told Uncle to "stick to what [he] talked to [Squires] about." In response, Uncle explained that he was getting "pretty concerned" about the loan and then, unexpectedly, related what the hard money lender told him on the phone. The prosecutor quickly changed the subject, redirected the conversation to what Squires said, and "never repeated or emphasized" the testimony. *See State v. Fahina*, 2017 UT App 111, ¶ 30, 400 P.3d 1177 (concluding that hearsay was harmless because it was brief and "never repeated or emphasized"). Given the low risk of prejudice of the statement in the context of Uncle's entire testimony, it was objectively reasonable for Squires's trial counsel to forgo an objection and avoid calling "undue attention" to the statement in isolation. *See Reid*, 2018 UT App 146, ¶ 47; *Harper*, 2006 UT App 178, ¶ 25.

¶45    Had the question itself been objectionable—along the lines of, "What did the hard money lenders tell you about Squires?"—the question of deficient performance would be closer. *See Landry v. State*, 2016 UT App 164, ¶ 27, 380 P.3d 25 ("If clearly inadmissible evidence has no conceivable benefit to a defendant, the failure to object to it on nonfrivolous grounds cannot ordinarily be considered a reasonable trial strategy." (cleaned up)). But the testimony here was elicited by an innocuous question. There was no way to know when the prosecutor asked the question that Uncle would relay what the hard money lender had told him. By the time Uncle made the challenged statement, it was arguably too late for trial counsel to remedy it.[9] Thus, Squires's trial counsel was not constitutionally

---

9. One sentence in Squires's reply brief hints that trial counsel was not only constitutionally ineffective in not objecting but was also constitutionally ineffective in not requesting a limiting

(continued…)

deficient, because it was a reasonable strategic decision not to highlight Uncle's unexpected and brief testimony. *See Reid*, 2018 UT App 146, ¶ 47; *Gray*, 2015 UT App 106, ¶ 44; *Harper*, 2006 UT App 178, ¶ 25.[10]

## II. Utah's Pattern of Unlawful Activity Act

¶46    Utah's Pattern of Unlawful Activity Act (the UPUAA or Act), Utah Code Ann. §§ 76-10-1601 to -1609 (LexisNexis 2017), criminalizes acts involving a "pattern of unlawful activity," which is defined as "conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics," *id.* § 76-10-1602(2). The Act targets three types of conduct. First, it prohibits "a principal of a pattern of unlawful activity from

---

(…continued)
instruction. In every other place in Squires's opening brief and reply brief, the argument is limited to whether trial counsel was deficient in not objecting to the alleged hearsay. "It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 (cleaned up). We accordingly limit our discussion to the lack of an objection by Squires's trial counsel.

10. Squires contends that if "this court is not convinced that individual errors warrant a new trial, this court may aggregate the errors under the cumulative-error analysis and order a new trial." Having discerned no constitutionally deficient performance by Squires's trial counsel, there are no errors to accumulate, and the cumulative error doctrine does not apply. *See State v. Beverly*, 2018 UT 60, ¶ 80, 435 P.3d 160.

using or investing the income derived from the unlawful activities" in an enterprise. *State v. Stewart*, 2018 UT 24, ¶ 6, 438 P.3d 515 (citing Utah Code section 76-10-1603(1)). Second, it "penalizes the acquisition or maintenance of an interest in or control of any enterprise that undertakes a pattern of unlawful activity." *Id.* (citing Utah Code section 76-10-1603(2)). Finally, the Act "forbids a person from participating in, or conducting, the affairs of an enterprise engaged in a pattern of unlawful acts." *Id.* (citing Utah Code section 76-10-1603(3)). Each subsection of section 76-10-1603 thus requires an "enterprise" and a "pattern of unlawful activity." *See* Utah Code Ann. § 76-10-1603.

¶47 Squires contends that his conviction under the UPUAA should be vacated because the State's evidence was insufficient. He asserts (1) that the State "failed to present any evidence that [Fitz Roy] was an 'enterprise'" and (2) that the "State's allegations of multiple acts of communications fraud . . . are insufficient" to establish a pattern of unlawful activity. We first address whether the State provided sufficient evidence of an "enterprise" and then turn to whether Squires's communications with Uncle amounted to a "pattern of unlawful activity."

A.    Enterprise

¶48 "Enterprise" is defined by the UPUAA as "any individual, sole proprietorship, partnership, corporation, business trust, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, and includes illicit as well as licit entities." Utah Code Ann. § 76-10-1602(1) (LexisNexis 2017). The existence of an "enterprise" is a separate element of a UPUAA violation and must be proved by the State. *State v. McGrath*, 749 P.2d 631, 636–37 (Utah 1988); *see also State v. Bell*, 770 P.2d 100, 103 n.2 (Utah 1988) ("[P]roof of the existence of an enterprise and its relationship to the racketeering activity is essential for a conviction under [the UPUAA].").

¶49    The State provided ample evidence that Fitz Roy is an "enterprise." *See State v. Workman*, 2005 UT 66, ¶ 29, 122 P.3d 639 ("We will reverse a jury verdict for insufficient evidence only if we determine that reasonable minds could not have reached the verdict." (cleaned up)). In rejecting Squires's motion for a new trial, the trial court listed some of this evidence. The court observed that (1) the State submitted evidence that Squires was an employee of Fitz Roy; (2) Squires was paid by Anderson; (3) Fitz Roy was an investment company that engaged in construction projects; (4) Fitz Roy was a licensed, legal entity; and (5) Squires wanted to become a partner in Fitz Roy when he told Anderson about Uncle's property. Squires's trial counsel even conceded in closing argument that "Fitz Roy was operating a business, and that could have been an enterprise that was used illegally." These facts, and the inferences to be drawn from them, reasonably support a finding by the jury of an "enterprise." *See McGrath*, 749 P.2d at 637. Thus, the trial court did not err in denying Squires's post-trial motions on this basis.

B.    Pattern of Unlawful Activity

¶50    The UPUAA is modeled after the federal Racketeer Influenced and Corrupt Organizations Act (RICO), and our supreme court has said that the UPUAA's definition of "pattern of unlawful activity" and RICO's definition of "pattern of racketeering activity" "should be interpreted to mean the same thing." *Hill v. Estate of Allred*, 2009 UT 28, ¶ 38, 216 P.3d 929. Relying on United States Supreme Court precedent interpreting the RICO statute, the court held that a pattern of unlawful activity requires "continuity plus relationship." *Id.* And "continuity," the court explained, is "'both a closed- and open-ended concept.'" *Id.* ¶ 39 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989)). A closed period of unlawful activity must extend "over a substantial period of time"; a "few weeks or months" will not do. *H.J. Inc.*, 492 U.S. at 242; *see also State v. Kelson*, 2012 UT App 217, ¶ 46, 284 P.3d 695,

*rev'd on other grounds*, 2014 UT 50, 345 P.3d 1136. Open-ended continuity, on the other hand, may span a shorter period of time but must include conduct that "by its nature projects into the future with a threat of repetition." *Hill*, 2009 UT 28, ¶ 39 (cleaned up); *see also Kelson*, 2012 UT App 217, ¶ 48 n.13 (explaining that the seventy-four drug transactions occurring over a four-month period in *State v. McGrath*, 749 P.2d 631 (Utah 1988), was the kind of activity that threatened future unlawful conduct).

¶51    Thus, "the proper test for determining whether there was a pattern of unlawful activity is whether there was a series of related predicates extending over a substantial period of time or a demonstrated threat of continuing unlawful activity and not whether there were multiple schemes." *Hill*, 2009 UT 28, ¶ 41 (cleaned up). In *Kelson*, this court applied this test and vacated a conviction for a pattern of unlawful activity based on securities fraud when the defendant's alleged crimes "took place over a matter of days" and did "not threaten future criminal conduct." 2012 UT App 217, ¶ 48 & n.11 (cleaned up).

¶52    Federal courts interpreting RICO have reached similar conclusions. Indeed, under RICO it "is well established that a single scheme to accomplish one discrete goal, directed at a finite group of individuals, with no potential to extend to other persons or entities, rarely will suffice to establish a threat of continuing racketeering activity." *Pagel v. Washington Mutual Bank, Inc.*, 153 F. App'x 498, 502 (10th Cir. 2005); *see also Western Assocs. v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) ("If a plaintiff alleges only a single scheme, a single injury, and few victims it is virtually impossible for plaintiffs to state a RICO claim." (cleaned up)); *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) (concluding there was not a pattern of racketeering activity when there "was only one victim," "one scheme," and "one type of injury").

¶53 Here, the State cannot establish closed-ended continuity, because Squires's predicate acts of communications fraud extended over a short period of seven to eight months. *See H.J. Inc.*, 492 U.S. at 242; *see also Midwest Grinding*, 976 F.2d at 1024 (listing cases in which closed periods of eight months and longer were "considered insubstantial"). Squires first contacted Uncle about the transaction in early 2008, and by September of that year, the transaction had failed.

¶54 Neither can the State establish open-ended continuity, because Squires's communications with Uncle did not "by its nature project[] into the future with a threat of repetition." *See Hill*, 2009 UT 28, ¶ 39 (cleaned up). Squires's communications were directed at a single victim (Uncle), sought to accomplish a single goal (using Uncle's property to obtain a loan), and inflicted only one type of injury (loss of Uncle's property). There was never any scheme to obtain other property from Uncle or to use Uncle to fund other projects, and Squires's communications with Uncle do not suggest that Uncle would be used for fraudulent funding projects in the future.

¶55 Though the *Hill* court stated that the inquiry is not whether there are multiple schemes, it emphasized that a pattern of unlawful activity must demonstrate "continuity plus relationship" and sought conformity with federal law. *Id.* ¶¶ 38–39, 41. Under *Hill*, a single scheme may suffice to establish a pattern of unlawful activity, but when linked with a short period of time, few victims, and only one type of injury, a pattern of unlawful activity is not demonstrated. *See Kelson*, 2012 UT App 217, ¶ 48; *see also Pagel*, 153 F. App'x at 502. Because Squires's communications with Uncle did not amount to a "pattern of unlawful activity" as a matter of law, we conclude that there was insufficient evidence to support the verdict on this count and it was therefore error for the trial court to deny Squires's motion to arrest judgment.

CONCLUSION

¶56 We conclude that Squires's trial counsel was not constitutionally ineffective for not objecting to the jury instructions on communications fraud. Nothing in the plain language of the statute or Utah or federal caselaw so clearly requires a specific-intent instruction in the circumstances present here that Squires's counsel could be deemed constitutionally deficient for not arguing for such an instruction. We also conclude that trial counsel was not deficient in failing to request a "presently existing fact" instruction, because neither the plain language of the communications fraud statute nor controlling Utah caselaw has adopted the civil standard for fraud.

¶57 We next conclude that Squires's trial counsel was not constitutionally ineffective for not objecting to Uncle's testimony about the hard money lender's out-of-court statements. Uncle's testimony was unanticipated and brief, and Squires has not demonstrated that it was unreasonable for trial counsel not to highlight that testimony. Accordingly, we affirm Squires's convictions for communications fraud.

¶58 Finally, we reverse Squires's conviction for a pattern of unlawful activity because the State did not demonstrate that Squires's communications extended over a substantial period of time or threatened future criminal conduct. We therefore remand the case to the trial court with instructions to enter a judgment of acquittal on the pattern of unlawful activity charge.

———————